EDMONDS, J.
 

 The City of Manhattan Beach fronts on the Pacific Ocean. Along its westerly boundary lies a strip of sandy beach, about 125 feet wide, which is said to constitute its principal charm and main attraction. By this suit, filed in 1924 but not brought to trial until 1935, the city seeks to quiet title to a public easement over this land which extends from its southerly boundary approximately 3,500 feet to the north. The superior court decided against the city, which appealed from the judgment rejecting its claims.
 

 In 1901 Manhattan Beach Company was the owner of a large tract of land fronting on the Pacific Ocean. This was originally a part of the Rancho Sausal Redondo y Guaspito comprising 22,458 acres and having a westerly boundary which was described in the patent as “following the meanders of the sea beach or easterly shore of shoal water bay at ordinary high water line”. The property of the Manhattan Beach Company was conveyed to it by two deeds in which the westerly boundary was described as “ordinary high water mark” and “along the high water mark” of the ocean. The subdivision of this property, according to two maps filed for record in 1901 and 1902 respectively, occasioned the present controversy. By these maps the city contends the owners dedicated for public use the strip of land in question. It also claims that there was an implied offer of dedication by the public use of the property for recreational purposes with the owner’s encouragement and consent and that both that offer and the express offers made by the recordation of the maps were accepted. Other points urged as grounds for reversal of the judgment concern rulings on evidence offered at the trial.
 

 Some years after the subdivision maps were filed the interest of Manhattan Beach Company passed to James G. Cortelyou and later to Manhattan Beach Development Company who are the defendants in this action and the respondents
 
 *657
 
 upon appeal. However, after the suit was filed their interests passed to other owners who have carried on the litigation in the names of these defendants.
 

 Each of the maps recorded by Manhattan Beach Company shows the land then owned by it which comprised a tract extending some 3,500 feet along the Pacific Ocean and upland for an average distance of probably 1400 feet. The map filed for record in 1901 shows the subdivision into lots and blocks of a rectangular-shaped parcel lying in the southwest corner of the tract and extending 2,760 feet along the ocean and about 600 feet upland. On the westerly side of this map there is a meander line without designation indicating the shore of the ocean. To the east of this line and approximately parallel with it there is another meander line marked “High Tide Line”. Farther east and roughly parallel with the two meander lines is a straight dotted line which has no designation. Immediately east of the dotted line a 50-foot right-of-way for an electric railroad is shown. About 100 feet from the northerly boundary of the land outlined for subdivision the dotted line, which south of this point is shown as being west of the westerly boundary of the right-of-way, crosses it and continues northerly within the right-of-way. In other words, for about 100 feet south of the northerly boundary of the property subdivided by this map, the right-of-way encroaches on the land between the dotted line and the meander line marked “High Tide Line”. Between the dotted line and the meander line marked “High Water Line” the words “The Strand” appear twice. To the east of the railroad right-of-way there is a 15-foot space open to the streets which extend in an easterly and westerly direction, and the blocks nearest the ocean front on this space.
 

 On this map under the heading “Description” appears the following: “The land embraced on this Plat of Manhattan Beach is a part of land . . . conveyed to Manhattan Beach Co. . . . more particularly described as follows, to-wit: Beginning at a 4" x 4" stake known as high water mark of Pacific Ocean at the N W Cor. of said land” thence by metes and bounds “to a 3" x 4" stake at high water mark, thence N 22° 09' W 2760.7 ft. to the place of beginning. . . . Other Lots and Blocks designated therein are only proposed allotments for a supplemental map and are only introduced to show the lines of So Oal Ry., [not referring to the right-of-way along the beach] the proposed allot
 
 *658
 
 ments hereafter intended to be made, surveyors’ marks and other important bearings. Note: Colored portion only dedicated and recorded by this map ’ ’.
 

 The northerly, easterly and southerly boundary of the land described is outlined on the map in red. The closing course of the description, according to the testimony of a surveyor, follows the dotted line exactly. The ends of this line are also colored red; that is to say for a short distance from the point at which the dotted line meets the line shown as the northerly boundary of the proposed subdivision the dotted line is colored and for approximately the same distance from the point at which it meets the line shown as the southerly boundary of the tract it is also colored.
 

 Under the word “Dedication” the following is also shown on the map: ‘ ‘ The Manhattan Beach Company, a corporation, hereby declares that it is the owner of that portion of the lands embraced in the annexed Plot lying within the colored border line thereon, that it has caused the same to be surveyed, platted, and that it does hereby designate as public thoroughfares all of those portions marked thereon as “The Strand, alleys and public grounds not otherwise deeded for street car purposes”. There also appears on the map a certified copy of a resolution of the board of supervisors of Los Angeles County by which it is ordered that all streets and alleys appearing upon the map “and therein offered for dedication be and the same hereby are accepted as public streets and alleys”. The map filed for record in 1902 shows as a subdivision all the property comprising the large parcel which is delineated on the 1901 map lying easterly of the dotted line except the rectangular piece which was there plotted into lots and blocks. This land borders the ocean for 700 feet to the north of the first subdivision, and the lines on the first map, which have been described as dividing what may roughly be termed the beach into several strips running parallel with the ocean, continue through the land to the north. In other words, that portion of the land in the second subdivision which fronts on the ocean is depicted in the same manner as is the land along the beach on the first map, with the exception that the dotted line on this map is marked “High Water Line”.
 

 Under the title “Description” the following appears on the 1902 map: The land embraced in this plat of Manhattan Beach Division No. 2, is a part of a tract of land . . .
 
 *659
 
 more particularly described as follows, to-wit: Beginning at a point at high water mark of the Pacific Ocean” thence by metes and bounds to the place of beginning. “Other Lots and Blocks designated are only proposed allotments for a supplemental Map and are only introduced to show the line of So Cal By, the proposed allotments hereafter intended to be made, surveyors marks and other important bearings. Note Colored portion only dedicated and recorded by this Map. ’ ’ The boundaries so described are colored red, this map differing from the first one in that the dotted line which is the westerly course is entirely instead of partly colored. Under the word “Dedication” the map also shows the following : ‘ ‘ The Manhattan Beach Company, a corporation, hereby declares that it is the owner of that portion of the lands embraced in the annexed plat lying within the colored border line thereon; that it has caused the same to be surveyed and platted and that it does hereby dedicate as public thoroughfares all of those portions marked thereon as Streets, the Strand, alleys and public grounds, not heretofore deeded for Street Car purposes. ...”
 

 At the opening of the trial the respondents filed a written disclaimer of any interest in the land which is shown on the 1901 map as lying between the dotted line and the electric railway right-of-way. This is a wedge-shaped strip extending from the southerly boundary of the land originally owned by Manhattan Beach Company, at which point it is about eight feet in width, approximately 1100 feet to the north where the dotted line meets the westerly boundary of the right-of-way. The respondents also disclaimed any interest in a piece of beach land shown on the 1902 map which had been conveyed to the city by deed some years before.
 

 Concerning the claim of the city that the property in controversy had been dedicated to public use by the recordation of the two maps, the trial court found that so much of it as is shown on the 1901 map was “depicted upon said map as lying wholly outside said tract and likewise as being wholly outside the area dedicated and recorded by said map. . . . It was not the intention of said Manhattan Beach Company to include or to show any part of the property in controversy upon the recorded map of such tract, nor did it do so. It was not at any time the intention of said Manhattan Beach Company, either by the filing of such map for record or
 
 *660
 
 otherwise, to dedicate or offer to dedicate to or for public use any part of the property now in controversy, nor did it do so. Neither the recordation of said map nor any other act or thing done in connection therewith constituted either a dedication or an offer to dedicate the property in controversy or any part thereof to or for public use.” A finding concerning the map filed in 1902 states the same conclusions in almost identical language.
 

 The appellant challenges the sufficiency of the evidence to support these findings. It contends that the maps are ambiguous and that it is the duty of this court to construe them without reference to the construction placed upon them by the trial court. However, the true rule in this. regard was stated in the case of
 
 Kautz
 
 v.
 
 Zurich General Ins. Co.,
 
 212 Cal. 576, 582 [300 Pac. 34, 37], where this court said: “The construction given the instrument by the trial court appears to be consistent with the true intent of the parties and where that is the case the appellate court will not substitute another interpretation although the latter seems equally tenable. ’ ’ But the findings of the trial court in this • case need not be measured by that rule because the record shows that evidence was received concerning the extent of the land locally known as “The Strand” at the time of the recordation of the two maps. Therefore, the findings of the trial court concerning the land offered for dedication by the maps rests in part upon evidence other than what is shown by the maps themselves.
 

 To constitute a dedication of land for public use there must be an offer by the owner to appropriate it for such purpose and the intention so to do must be clearly and unequivocally manifested. This is the vital principle of dedication. It was stated in the early case of
 
 Harding
 
 v.
 
 Jasper,
 
 14 Cal. 642, 648, and has been consistently followed since.
 
 {Smith
 
 v.
 
 San Luis Obispo,
 
 95 Cal. 463 [30 Pac. 591];
 
 Niles
 
 v.
 
 City of Los Angeles,
 
 125 Cal. 572 [58 Pac. 190].) Therefore, unless the maps recorded by Manhattan Beach Company and the evidence before the trial court in connection therewith show that clear and unequivocal intention on the part of the owner of the property which the law demands, they passed no title to the property in controversy.
 

 The appellant contends that the data on the two maps compel a holding that Manhattan Beach Company clearly intended to dedicate the property in controversy to public use;
 
 *661
 
 that each map embraces all land between the line of mean high tide shown thereon and the easterly boundary of the tract owned by the company; that the dotted line extending between the stakes at the southwesterly and northwesterly comers of each subdivision is a transit or meander line and was not intended to indicate any boundary; and that the colored lines imposed upon portions of the dotted line on the 1901 map, even if it be deemed that they were completed, only follow this transit or meander line. The respondents, on the contrary, assert that the maps and the data appearing upon them, together- with the evidence which was received to show the location of “The Strand”, abundantly support the findings of the trial court.
 

 A comparison of the maps shows that they are substantially the same so far as the method of describing the property to be subdivided and the form of the dedication clause is concerned. The description on each is by metes and bounds and includes a statement that “other lots and blocks designated” are shown only as “proposed allotments for a supplemental map ’ ’. Each description is further qualified by the statement that “Colored portion only dedicated and recorded by this map”. The two maps without question were prepared and recorded in order to plat in two subdivisions the entire parcel of land shown on each of them. The same westerly boundary line is described as the boundary for each subdivision and the maps may properly be construed together to determine the intention of the dedicator.
 

 One of the principal grounds urged by the city in support of its claims is the fact that “The Strand” is named in each dedication clause. The respondents’ answer to this contention is that “The Strand” was dedicated only if it lies within land particularly described and bordered as a subdivision. In this connection they claim that the maps and the evidence received in connection with them show that at least a part of “The Strand”, as it was known at the time of the recordation of the maps, was within the described boundaries of the proposed subdivisions, and that the language in the dedication clause referred to that land and not to the part of the beach which is here in controversy.
 

 Although it is true that ordinarily the terms high water line and high water mark are synonymous
 
 (F. A. Hihn Co.
 
 v.
 
 City of Santa Cruz,
 
 170 Cal. 436, 442 [150 Pac. 62]), in this ease the dedicator used them as referring to two dif
 
 *662
 
 ferent points on its land and made its maps accordingly. A solid meander line and a dotted straight line are shown on each map. Although the distance between them is not stated in feet it may be estimated by the scale of the map as being 50 feet or more. Obviously the solid line was intended to define the sinuosities of the ocean’s shore. The dotted line is a straight line between surveyor’s marks shown on the map and mentioned in the metes and bounds descriptions. They are given different names, which is some indication that the map-maker considered them as representing different positions on the land. Also, the lines representing the northerly and southerly boundaries of the property owned by the dedicator and shown on each map, extend to the dotted line but not to the meander line. The land shown on each map between the dotted line and the solid line has no indicated northerly or southerly boundary. All of these facts clearly and consistently point to an intention on the part of the dedicator to make the westerly boundary of each subdivision a surveyed line easterly of and at a distance from the high tide line named in the conveyances to it. Although doubts and conflicts appearing upon a map prepared and recorded by the owner of real property for the purpose of creating a subdivision of it are to be construed most strongly against him
 
 (Larkey
 
 v.
 
 City of Los Angeles,
 
 70 Cal. App. 635, 641 [233 Pac. 991]), the law has never allowed private property to be taken for public purposes except upon clear and unequivocal proof of an intention to dedicate it for such use.
 
 (Niles
 
 v.
 
 City of Los Angeles, supra.)
 
 “It is not a trivial thing to take another’s land, and for this reason the courts will not lightly declare a dedication to public use.”
 
 (San Francisco
 
 v.
 
 Grote,
 
 120 Cal. 59 [52 Pac. 127, 128, 65 Am. St. Rep. 155, 41 L. R. A. 335].)
 

 The appellant contends that the findings of the trial court ignore the words “The Strand” shown as a legend between the solid and dotted line of each map and included in the dedicatory clauses. However, the evidence received by the court in connection with the maps shows that at the time they were recorded the right-of-way had .been conveyed but the electric railroad had not been built; that “The Strand” was then locally known as the land extending from the westerly tier of lots in each subdivision to the high tide line; that at this time there was a walk adjoining the railroad right-of-
 
 *663
 
 way on the east which was signposted “The Strand”, and that this walk has been so designated on maps subsequently prepared by the city. When the maps are read in connection with this evidence, the descriptions of property on each, and the respective dedication clauses, they compel the conclusion that only the portion of “The Strand” lying east of the dotted line was dedicated to public use. Although between the northerly and southerly boundaries of the subdivision created by the 1901 map the dotted line is not colored for its entire distance, this is of no consequence when all the evidence bearing upon the question is considered. None of “the land embraced in this plat of Manhattan Beach” lies westerly of the dotted line, according to the metes and bounds description, and when all the data on the map are considered as a whole, nothing is presented from which an inference may fairly be drawn that the Manhattan Beach Company intended to appropriate the property lying between that surveyed line and the high tide line to the use of the public. Without such an intent there can be no dedication.
 

 The case of
 
 City of Los Angeles
 
 v.
 
 McCollum,
 
 156 Cal. 148 [103 Pac. 914, 23 L. R. A. (N. S.) 378], which is strongly relied upon by the appellant, decides a question dependent upon the intention of the person who recorded the subdivision map construed in that ease, to dedicate for public use a certain piece of land which was not marked as a street. It was 0 there held that the trial court was authorized, if not bound to conclude, from an inspection of the map that this land was intended as a public highway. The same thing may be said of the land shown by the maps in this case as lying between the railway right-of-way and the westerly tier of blocks. But the McCollum case presents neither reason nor authority for a holding that land lying without the limits of a proposed subdivision as shown on a map and also not included within the metes and bounds description of it, is offered for dedication. Likewise, in the case of
 
 Gross
 
 v.
 
 City of San Diego,
 
 125 Cal. App. 238 [13 Pac. (2d) 820], there was no question whether the land there in controversy lay within or without the exterior boundary of the subdivision which was created by recording a map of it. The contentions of the City of Manhattan Beach concern the boundary line of the proposed subdivision. The fact that certain land is unmarked and not within areas shown as private property
 
 *664
 
 does not evidence any intention on the part of the landowner to dedicate it for public use where it is not included within that portion of the entire tract which the recorded map, by drawing and description, designates as a subdivision carved out of the larger piece.
 

 As the second ground for the reversal of the judgment, the appellant claims that an implied dedication of the property in controversy was made by the predecessors in title of the defendants. Specifically, it is the contention of the city that the acts of Manhattan Beach Company in the years 1901 to 1904, inclusive, unequivocally manifested an offer to dedicate the beach land to public use for park and playground purposes, and that the finding of the trial court to the contrary is not supported by the evidence. The evidence relied upon by the city to establish such dedication consists principally of representations made by salesmen of Manhattan Beach Company to prospective purchasers of lots in the subdivisions. Certain acts of the subdivider which concern the use of the land are also relied upon in this connection.
 

 Apparently about the time the subdivision maps were recorded the company commenced a campaign to sell its lots. This was before automobiles were in common use and Manhattan Beach, strange as this now seems, was quite inaccessible *to Los Angeles, which had barely started its phenomenal growth. Until 1904, when the Pacific Electric Railroad was completed, the only means of transportation to Manhattan Beach was by the Santa Pe Railroad. Excursion parties were organized for prospective purchasers, and they were taken to the property by train. Maps of the site were distributed on the train, and at the property salesmen pointed out to the excursionists the advantages of the various lots which the company had for sale. Apparently three different maps were used in the sales campaign. One seems to be an exact copy, reduced in size, of the platted area shown on the subdivision map recorded in 1901, but the metes and bounds description, the dedication clause, and the colored boundary do not appear on it. Another is almost the same except that the meander lines along the beach are unmarked and the dotted line is not given. On the back of this map there is a summary of the advantages of the new community, one being "a beach that is unsurpassed for velvety smoothness”. The third map is
 
 *665
 
 the same as the one just described, but the advertising on the back is different. On this map the natural conditions surrounding the property are said to include a “wide sandy beach that cannot be equalled for safety and smoothness”.
 

 Several persons who purchased lots in those early years testified that they were shown the map first described, and that certain representations were made to them concerning “the Strand”. According to the testimony of these witnesses, one was told that “the beach would always be for the use of the people of Manhattan”. To another the salesman said that “the Strand was dedicated to the public”. A third witness recalled that the salesman assured him “that there will be no buildings allowed on the Strand, except a bathhouse which the company is going to erect for the benefit of the public and the purchasers of lots”. Another witness declared that he asked the salesman “about dedication of that property from the lots shown on this map fronting what is designated on the map as the Strand. I told him that I would not consider buying any of those lots down there unless that Strand and all the property between those lots I have just referred to and the ocean would be forever open to the public, nothing would be put on them”. According to the witness, the salesman replied that the land “was dedicated from those lots that are shown on this map clear to the water and that nothing would ever be put on there except the railroad” which then had not been built.
 

 In addition to this evidence, the city proved that from at least 1900 the beach has been used by the public generally for bathing, fishing, and general recreation purposes. It was admitted that there were comparatively few people along the beach in those early years, but those who came were never interfered with in any way. As a matter of fact, Mr. Cortelyou testified that they invited people to use the beach, “advertising the invitation extensively”. In 1903 the Manhattan Beach Company constructed a bathhouse on the beach and also built some picnic booths “designed to constitute an invitation to the public to use the beach”. Signs were placed on these structures reading, “Private property; permission to pass over revocable at any time”, but no similar signs were placed elsewhere on the beach, nor was it ever roped or fenced off. Prior to the commencement of this suit the public has roamed over the beach at will.
 

 
 *666
 
 This evidence, the city contends, should be considered as if no map had ever been recorded and as sufficient in itself to show an offer to dedicate the beach and an acceptance of that offer. However, a clear distinction must be drawn between the effect of representations made to prospective purchasers of lots in the subdivisions and the legal situation resulting from the general use of the property by the public without objection from the owners. Also, it must be remembered that this is an action by the city to establish a dedication of property for public use. The rules concerning dedication and those which define the rights of those who purchase property with representations that certain streets or other areas are or will be assigned for the benefit of the public are quite different. Much of the confusion in the reported cases is due to a .failure to recognize that one who has bought property from a sub divider may have» rights which the courts will enforce although there has been no dedication for the use of the public generally.
 
 (County of Inyo
 
 v.
 
 Given,
 
 183 Cal. 415 [191 Pac. 688];
 
 Eltinge
 
 v.
 
 Santos,
 
 171 Cal. 278 [152 Pac. 915, Ann. Cas. 1917A, 1143],) Cities or counties seeking to establish a dedication stand in an entirely different position from that of an individual who brings an action to quiet title to a private easement.
 

 The City of Manhattan Beach relies strongly upon the case of
 
 Phillips
 
 v.
 
 Laguna Beach Co.,
 
 190 Cal. 180 [211 Pac. 225], but the facts upon which that decision was made are essentially different from those which are here shown. In that case, the defendant created a subdivision by recording a map which showed • certain blocks divided into lots, and other rectangular-shaped areas numbered as blocks but not otherwise marked. Within a few days after this map was recorded, the corporation passed a resolution that within this subdivision certain property which was particularly described “shall be reserved for park purposes”. It also advertised that “the entire ocean frontage” had been reserved for a park. It was held that the land described in the resolution, which did not include all the areas marked only as blocks situated along the ocean frontage, had become a public park upon the ground that the
 
 resolution
 
 was a present offer to dedicate the land described and that the offer had been accepted by the public. Had the representations of the subdivider been held to have amounted to an offer to
 
 *667
 
 dedicate, “the entire ocean frontage” would have been included in the park, which the court limited to the area described in the resolution. There is nothing in this decision to support the claims of City of Manhattan Beach that representations made by a subdivider are sufficient to constitute an offer of dedication. On the contrary, the court came to an exactly opposite conclusion.
 

 A somewhat different situation appears in the case of
 
 Venice
 
 v.
 
 Short Line Beach Land Co.,
 
 180 Cal. 447 [181 Pac. 658], There it was shown that the subdivider had made a tentative map upon which the strip of land in dispute was designated as an alley or street. Thereafter, a map was filed upon which it was marked as lot 38. The record showed that in making sales of lots, the subdivider represented to several of the purchasers that this strip would be left open for a public street. Houses were afterward built upon the lots on each side of “lot 38”, several of the owners placing sidewalks on the land which they considered to be a public way, and it was used as such for nine years preceding the trial of the action. The evidence showed that vehicles had no other means of access to the buildings on one side of the land used as a street. ‘ ‘ This evidence, ’ ’ the court said, ‘ sufficiently shows the intention of the owners that this strip of land should be used by the public as a public street or alley for the convenience and benefit of the public and the owners of lots abutting thereon.” But “this evidence” is not limited to the representations of the subdivider. It includes the improvement and use of the street for many years in a manner wholly inconsistent with the retention of private ownership, and the fact that the street provided the only means of access to some of the lots. The decision is, therefore, not controlling upon the issues presented by the City of Manhattan Beach.
 

 Acts of a landowner from which the law implies a dedication of his property for public use as a street do not always lead to the same result where land is used for other purposes. This is very clearly illustrated in the case of
 
 F. A. Hihn Co.
 
 v.
 
 City of Santa Cruz,
 
 170 Cal. 436 [150 Pac. 62], There the city claimed that it had acquired title to a strip of land several hundred feet long adjoining a sand beach extending to the line of ordinary high tide. For many years, that portion of the property in controversy which was situated next to the beach had been used by the public for bathing and general recreation purposes. The other half was
 
 *668
 
 in use as a public highway or esplanade, and several years before the city had improved it with pavement.
 

 In this case it was held that the improvements made by the city so changed the character of the land used as a highway as to render it unfit for any other use and that the city had become the owner of at least an easement “coextensive with the use made by it under its authority”. But the evidence concerning the use of the other part of the land required a different conclusion, the court held. This land had not been improved and presented the same appearance as the beach along the high tide line. For many years the public had used it in the same manner as the adjoining beach. The owner never made any objection to this use of its property, and the city enforced ordinances regulating public beaches upon it as well as upon the land closer to the water.
 

 “This evidence”, the court said, “was not sufficient to establish the city’s ownership of a prescriptive right in the land. The use by the public would not vest an interest in the city for the reason, among others, that the use was by the public generally, not merely by the inhabitants of Santa Cruz. The mere fact that the city passed ordinances regulating the use of its public lands and that its officials undertook to enforce those ordinances on private property certainly falls far short of fulfilling the requirements of an adverse possession. . . . But beyond all this, we think the evidence was not such as to support a finding of dedication. In order to constitute a valid dedication, there must be an intention on the part of the owner to devote his property to the public use.
 
 (California Nav. Co.
 
 v.
 
 Union Transp. Co.,
 
 126 Cal. 433 [46 L. R A. 825, 58 Pac. 936];
 
 Niles
 
 v.
 
 Los Angeles,
 
 125 Cal. 572 [58 Pac. 190].) It is true that this intent may be inferred from long acquiescence in a use by the public. (13 Cyc. 455.) But where land is uninclosed and uncultivated, the fact that the public has been in the habit of going upon the land will ordinarily be attributed to a license on the part of the owner, rather than to his intent to dedicate. (13 Cyc. 484.) This is more particularly true where the use by the public is not over a definite and specified line, but extends over the entire surface of the tract. (13 Cyc. 484.) It will not be presumed, from mere failure to object, that the owner of such land so used intends to create in the public a right which would practically destroy his own right to use any part of the property.”
 

 
 *669
 
 Application of these principles to the facts presented by the City of Manhattan Beach indicates clearly that the representations of the subdivider did not amount to an offer of dedication, and, in any event, that there was no acceptance of such an offer. The evidence also shows that the deed made by Manhattan Beach Company to each purchaser of property referred to a recorded map; hence the grantee took with notice that the portion of “The Strand” lying westerly of the dotted line shown on that map had not been dedicated. The declarations that are said to have been made to individual buyers of lots conferred no rights upon the public and no dedication resulted from them.
 

 The Manhattan Beach Company claimed title to the strip of beach and exercised acts of dominion over it long after the recording of the two maps and the making of the representations testified to by the several witnesses; this is shown by deeds which were later executed conveying certain portions of, and in one instance, all of the land. In 1907 the company gave the county of Los Angeles a deed to a strip of land- extending 20 feet on each side of the center line of Center Street, the main east and west street of the village, and the prolongation thereof to the Pacific Ocean. In 1909 a small parcel lying at the extreme southerly end of the strip of beach was conveyed to the city of Hermosa Beach. This deed described the property conveyed as being bounded on the west by the Pacific Ocean. In 1912, the corporation conveyed to the respondent Cortelyou a large number of lots in each subdivision and also the strip of beach land, which is described as being bounded on the west by the Pacific Ocean. In the same year Mr. Cortelyou rented to the city a small real estate office which was located at the entrance to the pier and was used by the city manager. In 1915 the city accepted from Mr. Cortelyou a deed to that portion of the beach land extending for 100 feet on each side of the prolongation of Center Street from the railroad right-of-way “to the waters of the Pacific Ocean”. Later title to the property now claimed by the city passed from Mr. Cortelyou to the respondent Manhattan Beach Development Company, and in 1921, the latter made some plans, which were known to the then city attorney, to record a subdivision map of it.
 

 It thus appears that long after the acts which are relied upon to establish dedication, the county of Los Angeles and the appellant accepted deeds to part of the land, and that
 
 *670
 
 the city asserted no title to the land which it now claims when it was dealt with by Manhattan Beach Company and its grantees as their own. These acts of the city are entirely inconsistent with its present position. They constitute a recognition of the rights of the respondents and their predecessor at the very time the city now claims it had acquired title by dedication, and are at least an interpretation by conduct of the dedication clauses on the maps.
 
 (City of Oakland
 
 v.
 
 Oakland Water Front Co.,
 
 162 Cal. 675 [124 Pac. 251].)
 

 The appellant also claims that each of several rulings of the trial judge upon the admission of evidence is erroneous. First, it contends that it should have been allowed to offer evidence concerning the general reputation that the property had been dedicated. This contention cannot be sustained. “A public highway cannot be proven by showing that it was generally reputed to be a public highway. ’ ’
 
 (Shepherd
 
 v.
 
 Turner,
 
 129 Cal. 530 [62 Pac. 106].) Its second point concerns the admission of evidence showing the payment of taxes upon the property by the respondents and their predecessors. Such evidence does not raise an estoppel
 
 (Lantz
 
 v.
 
 City of Los Angeles,
 
 185 Cal. 262 [196 Pac. 481]) and is not sufficient to rebut the proof of dedication if the proof is otherwise sufficient
 
 (City of Venice
 
 v.
 
 Short Line Beach Co., supra),
 
 but the record shows that it was received for the limited purpose of showing conduct consistent with the ownership of the property. There was no error in that ruling.
 

 The appellant also asserts that the court erred in refusing to receive into evidence the declarations of John A. Merrill, made in 1925, that the Manhattan Beach Company, of which he was president at the time the subdivision maps were filed, had dedicated the land. The corporation did not own the land at the time Mr. Merrill made the proffered statement, which therefore was inadmissible for any purpose. The acts and declarations of a grantor made after he has parted with title are uniformly held to be incompetent
 
 (People
 
 v.
 
 Southern Pac. R. R. Co.,
 
 68 Cal. App. 153 [228 Pac. 726]), and
 
 a fortiori
 
 this principle applies to a former officer of a grantor corporation.
 
 (Ferguson
 
 v.
 
 Basin Consolidated Mines,
 
 152 Cal. 712 [93 Pac. 867]; 10 Cal. Jur. 1092.) This rule is especially applicable when the declara
 
 *671
 
 tion is made out of the presence of the adverse party.
 
 (Rocha
 
 v.
 
 Rocha,
 
 197 Cal. 396 [240 Pac. 1010].)
 

 The judgment is affirmed.
 

 Curtis, J., Waste, C. J., Langdon, J., and Seawell, J., concurred.