[L. A. No. 22507.   In Bank.   Dec. 30, 1953.]

NEIL S. McCARTHY et al., Appellants, v. CITY OF MAN-
HATTAN BEACH, Respondent.

Cosgrove, Cramer, Diether & Rindge, John N. Cramer, Leonard A. Diether and J. D. Barnum, Jr., for Appellants.

Clyde Woodworth, City Attorney, Dunlap, Holmes, Ross & Woodson for Respondent.

SPENCE, J.—Plaintiffs sought a judgment declaring that a certain zoning ordinance restricting the use of their oceanfront property to beach recreational purposes is "null and void" as applied to them. In the first cause of action they challenged the constitutionality of the zoning restriction insofar as it affects their land, claiming that it violates the due process and equal protection clauses of both the federal and state Constitutions and results in a taking of their property for public use without compensation. (U.S.C.A. Const. Amend. XIV, § 1; Cal. Const. art. I, § 13.) They also alleged that the restrictive use is unreasonable, arbitrary, and discriminatory, and is an abuse of legislative discretion. In their second cause of action they challenged the validity of the zoning restriction on the ground that it was not passed in good faith but was adopted pursuant to a scheme, conceived by the mayor and members of the city council, to depress the value of plaintiffs' property so that it could be acquired for public park purposes at the lowest possible price. The trial court decided in favor of the city; and settled legal principles sustain the propriety of its judgment.

Plaintiffs are the owners of approximately three-fifths of a mile of sandy beach frontage in the city of Manhattan Beach. The property extends from 1st Street, which is the south boundary of the city adjoining Hermosa Beach, to 13th Street. It is a strip of land varying in width from 174 to 186 feet and having an average slope of 1 to 2 feet vertical

in 10 feet horizontal. It is bounded on the west by the Pacific Ocean and on the east by a state park, which was formerly a 50-foot right of way belonging to the Pacific Electric Railway Company. To the east of this former right of way and extending along the city's entire ocean frontage is a cement walk, 15 feet wide, and called "The Strand." Back therefrom are residential and business houses. As it parallels plaintiffs' property running from south to north, the strand varies in elevation from 2 to 15 feet above the Pacific Electric's former right of way, which in time of storm and on other occasions has been covered with water.

In 1924 the city brought a quiet title action with respect to the property now owned by plaintiffs, upon the claim of the subdividers' dedication of the land for public use according to certain recorded maps. The action, tried in 1935, resulted in a judgment against the city and title was quieted in plaintiffs' predecessors in interest. The judgment was affirmed on February 15, 1938. (*Manhattan Beach* v. *Cortelyou*, 10 Cal.2d 653 [76 P.2d 483].) Since at least 1900 the property has been continuously used for public beach purposes. (*Ibid.* p. 665.) In 1929 it was classified under the city's ordinance (No. 337) into a single-family residence district. Following the final judgment in the quiet title action and over a period of several years, plaintiffs and the city cooperated in various unsuccessful efforts to cause the property to be acquired through sale or lease by the public authorities. Resolutions were passed by the city from time to time declaring its present lack of funds for acquisition of the property but recommending that the county or state allocate money so that continued "use of the property as a public beach" could be preserved. In discussion of the matter with plaintiff Neil S. McCarthy, both the mayor and city attorney expressed their hope that the property would not be sold or improved so as to increase the cost of its acquisition by the public authorities.

On June 24, 1940, Mr. McCarthy advised the mayor by letter that upon assurance from the city officials that arrangements were being made to acquire the property, he had delayed putting it on the market during the main selling season; and that in the hope then of deriving some revenue from the property, he was arranging to enclose it and charge admission for its use. An emergency ordinance passed by the city on July 1, 1940, prohibited the erection of any barbed wire fence in the city without first obtaining a written permit from the city council. McCarthy secured such a permit and

immediately began construction of the desired fence. It was never fully completed, as parts of it were destroyed by the public at various times during its building and finally it became necessary to remove the fence entirely. On July 30, 1940, McCarthy by letter notified the city council of these difficulties, demanded police protection, and stated his intention of holding the city responsible for all damages suffered.

By letter of August 12, 1940, McCarthy advised the city council of his belief that the property could not be sold or subdivided for residential purposes and requested a rezoning of the property for business purposes. Pursuant to the recommendation of the city planning commission after a public hearing, the city council on August 22, 1940, denied the request. Then on June 26, 1941, the city council adopted the zoning ordinance in question (No. 502), whereby under section 10 plaintiffs' property could be used only for beach recreational activities and for the operation of beach facilities for such activities for an admission fee; and the only structures permitted thereon were lifeguard towers, open smooth wire fences and small signs. Meanwhile the city was still interested in plaintiffs' property for a public park and carried on negotiations with the state looking toward its acquisition. In 1948 the state commenced an action to condemn the property for park purposes but it has not yet been brought to trial.

Plaintiffs made no use of their property as permitted by the 1941 zoning ordinance nor did they receive any income therefrom. In 1950 they applied to the city for a modification of the ordinance so as to change the classification of their property from "Beach Recreational District" to "Single Family Residence District." Plaintiffs had paid taxes on their property ranging from approximately $4,200 in 1940 to approximately $9,000 in 1950. The rezoning application was referred to the city planning commission and, after public hearings, was denied on January 10, 1951. The city council denied the application on March 6, 1951. Plaintiffs thereupon brought this action for declaratory relief.

The trial court found, in part, that plaintiffs' property is, from time to time, subject to erosion and replacement by reason of storms and wave action of the Pacific Ocean; that any residences which could be constructed upon the property would necessarily be erected on pilings, and reasonable minds might differ as to the safety of residence properties so constructed;

that such construction might also create police problems by reason of possible uses of the areas underneath the residences for immoral purposes; that one of the principal characteristics of the city is its beach advantage bordering upon the Pacific Ocean; that at all times since adoption of the 1941 ordinance, plaintiffs' property has been suitable for use and has been used by the city and visitors thereto for beach recreational purposes; that it is not true that the city, through its mayor and councilmen, or otherwise, conceived any scheme designed to accomplish the keeping of the property unimproved so it could be used as a public beach recreational area or to depreciate the value of the property so as to enable the public authorities to acquire it at the lowest possible price. The court also found that "reasonable minds might reasonably differ and might have in the year 1941 reasonably differed" as to the following matters: whether the property is or was suitable for residential or commercial development; whether the city would be subjected to liability by reason of the necessity of employing lifeguards, wrecking crews and salvage employees to protect the property and installations thereon from the ravages of high tides and frequent storms; the propriety of the enactment of the zoning restriction declared in section 10 of the 1941 ordinance; and the proper classfication of the property as being within a beach recreational district. Upon such findings the court concluded that the zoning restriction is a valid enactment within the city's police power; that it does not deprive plaintiffs of their property without due process of law or deny them the equal protection of the laws; that it has a foundation in reason and is not a mere arbitrary or irrational exercise of power; and that the scheme of classification and districting followed in the ordinance "has been applied fairly and impartially in the instance of plaintiffs' property." The appeal is from the judgment entered in substantially this same language.

As stated in *Clemons* v. *City of Los Angeles*, 36 Cal. 2d 95 [222 P.2d 439], a zoning ordinance enacted pursuant to a comprehensive plan of community development, "when reasonable in object and not arbitrary in operation," will be sustained as a proper exercise of the police power; every intendment is in favor of its validity, and a court will not, "except in a clear case of oppressive and arbitrary limitation," interfere with the legislative discretion; it is presumed to be adapted to promotion of the public health, safety, morals and general welfare; and though the court may differ

with the zoning authorities as to the "necessity or propriety" of the regulation, so long as it remains a "question upon which reasonable minds might differ," there will be no judicial interference with the municipality's determination of policy.

Ordinance 502 comprehends a city-wide zoning plan. It provides for 10 zoning districts in the city. Only four districts are material here: R-2 for two-family residences; R-3, for limited multiple-family residences; B-1, a beach recreational district; and C-1, for retail commercial purposes. The property west of the strand is in zone B-1. That property consists of plaintiffs' land, the beach frontage adjoining on the north thereof, and the Pacific Electric's former right of way. Prior to the passage of this ordinance, the beach frontage north of plaintiffs' land was acquired by the state for state park purposes, and some years thereafter (1948) the mentioned right of way was similarly acquired for park purposes. Accordingly, when plaintiffs commenced this action, theirs was the only privately owned property in zone B-1.

Section 1 of ordinance 502 declares: "In order to provide the economic and social advantages resulting from an orderly planned use of land resources and to conserve and promote the public health, safety and general welfare, there is hereby adopted and established an Official Land Use Plan for the City of Manhattan Beach . . . ." A planning consultant who had assisted in drafting the zoning ordinance testified that the intent of the district classifications was to "produce a plan meeting all of the various zoning needs of the city . . . a balanced plan . . . including, among other things, one section . . . eminently suited . . . for beach recreation." He further stated that in his opinion the cost of home-building would be relatively high on the beach frontage and therefore inclusion of that beach area in zone R-1 might be deemed "unreasonable zoning"; that home-building in that area might also destroy certain values which residential sections developed just back of the strand had long enjoyed; and that he therefore had recommended to the city planning commission the creation of the "beach recreation zone which would give the owners of the property the right to derive an income from it." Another expert witness on zoning problems testified that the ordinance properly provided for a beach recreational area to "take advantage" of the city's "natural resource or asset," its "ocean frontage," which accounted for its original development as a community.

The secretary of the planning commission, who had been an employee of the city since 1937 and its building inspector for the past nine years, testified that there had been some heavy storms at the beach; that barge boats and barge tenders had drifted onto the beach; that in a heavy storm he had seen the breakers come over the Pacific Electric's former right of way—splash over it. The city's chief of police for the past 17 years testified that on two or three occasions he had seen water against the westerly edge of the right of way—in the area near 1st, 5th and 9th Streets; that one of the occasions was some 17 years ago, when a barge was washed ashore on 1st Street.

In support of their claim that their property was suitable for residential development, plaintiffs called as a witness Colonel Leeds, a qualified civil and consulting engineer. He testified that any residence construction on plaintiffs' property would have to be on pilings; that he would place the structure on concrete or steel piles, the top of which would be at an elevation of approximately 20 feet above the mean low water; that he had prepared a diagram, admitted in evidence as plaintiffs' Exhibit 62, showing residential development of plaintiffs' property, allowing 35 feet west of the Pacific Electric's former right of way (the state park strip) for a public roadway and the next 75 feet oceanward for the construction of houses on piling; that in his opinion houses so erected would be safe from damage from the ocean. On cross-examination, he testified that he did not know that on occasion the Pacific Electric's former right of way at Manhattan Beach had been under water; that he did not know that heavy sea and storm water had come up over the strand in 1938 and caused severe damage; that he had not made any investigation as to whether the city would approve a 35-foot roadway; that he had seen no subdivision plan for this beach area; that in forming his opinion as to the safety of constructing houses on plaintiffs' property, he had considered the presence of houses at Hermosa Beach, adjoining plaintiffs' property on the south, and that the front of the houses built on plaintiffs' property would be westerly of the front of the houses on Hermosa Beach; that the height to which water is projected shoreward depends upon wave and wind action— ground swells are a form of wave; that damage to piers and structures on beaches is usually caused by ground swells, which are produced by distant storms or submarine earth-

quakes—in other words, there may be heavy ground swells along a beach on a perfectly calm day; that he would construct the houses on pilings driven about 10 feet below low water, so that if an unanticipated storm should occur, it could gouge out several feet of the beach and the house would still stand and be safe. He was then asked the following question: "Would you feel, Colonel, that intelligent and reasonable minds might reasonably differ as to the possible danger of construction of residences in accordance with the scheme indicated on Exhibit 62?" He replied: "Yes, I think you would find difficulty in getting all engineers to agree on one solution as being the only solution. It would depend on the degree of safety that you wanted, and various other factors. Only a very, very foolish engineer claims to be infallible." Plaintiffs argue that such admission was limited to the proposed residential plan of Colonel Leeds and did not signify that engineers would differ in opinion as to the safety of houses built in accordance with other plans, such as higher, stronger or differently arranged pilings. This may be true as an abstract proposition, but there was no testimony to that effect. Obviously, as the city concedes, many structures are apparently safely erected many miles out in the ocean, such as off-shore oil drillings and pumping derricks, and undoubtedly it would be possible at considerable expense to have safe residential construction on plaintiffs' property if the pilings were driven deeply enough and the houses built high enough to eliminate threatening ocean tide and wave action. However, the question is not whether it may be humanly possible to build houses on plaintiffs' property which would be safe in times of storms, high tides and ground swells, but whether such beach property is suitable for residential development pursuant to some representative plan such as that proposed by Colonel Leeds and as to which he himself admitted there could be a difference of opinion in regard to the safety factor.

It was stipulated that the judge might view the property and that he might consider as evidence everything that he saw in making such inspection. The visit was made in the company of an attorney for plaintiffs, an attorney for the city, and the clerk of the court. Thereafter the judge made a statement in open court regarding his observations. Among other things, he noted that the westerly side of the proposed 35-foot roadway was at least 12 feet lower than the general level of the Pacific Electric's former right of way; that the

westerly side of the proposed roadway was beach that was obviously subject to flooding at extremely high tides or during storms; that if the proposed houses were built on plaintiffs' property westerly of the proposed 35-foot roadway, they would be right on the beach and unless they were protected by an adequate sea wall, they would be subject to a constant hazard of destruction by the sea. After stating that counsel during the visit to the premises had expressed no difference of opinion with his observations, the judge made the further remark that his view of plaintiffs' property demonstrated to him that the safety of the proposed construction of houses thereon was "a question upon which reasonable minds might differ."

The trial judge's view of plaintiffs' property with the consent of counsel is evidence in the case and "may be used alone or with other evidence to support the findings." (*Noble* v. *Kertz & Sons Feed etc. Co.,* 72 Cal.App.2d 153, 159 [164 P.2d 257]; see, also, *Wilkins* v. *City of San Bernardino,* 29 Cal.2d 332, 348 [171 P.2d 542]; *Safeway Stores* v. *City Council, San Mateo,* 86 Cal.App.2d 277, 284 [194 P.2d 720]; *Wheeler* v. *Gregg,* 90 Cal.App.2d 348, 366 [203 P.2d 37]; *Sindell* v. *Smutz,* 100 Cal.App.2d 10, 15-16 [222 P.2d 903].)

Plaintiffs argue that the trial judge's observations are not evidence because he did not view the premises under storm conditions. They cite on this point *Fendley* v. *City of Anaheim,* 110 Cal.App. 731 [294 P. 769]. The plaintiffs there claimed that defendant's operation of a power plant jarred their residence and caused damage. The evidence established that most of the discomforts occurred at nighttime. There was no evidence to the contrary and in such circumstances, the trial court's inspection of the premises in the daytime was an insufficient basis to sustain its finding that the operation of the plant caused no discomfort to plaintiffs. Here, however, neither the expert witness, Colonel Leeds, nor the trial judge purported to recite existing conditions and physical facts observed on a visit to plaintiffs' property during time of storm. There was, moreover, undisputed evidence that in stormy weather sea water had extended further landward than plaintiffs' property. The trial judge merely applied such uncontradicted evidence to his own observations of the physical topography of the premises in determining the safety of residential development on piling construction

along the beach frontage. ▇ Expert testimony is to be given the weight to which it appears in each case to be justly entitled. In the event of conflict, the law ordinarily makes no distinction between expert testimony and evidence of other character; either may be accepted by the trier of fact as the basis for findings on disputed factual issues. (*Arais* v. *Kalensnikoff*, 10 Cal.2d 428, 432 [74 P.2d 1043, 115 A.L.R. 163]; *Liberty Mut. Ins. Co.* v. *Industrial Acc. Com.*, 33 Cal. 2d 89, 94 [199 P.2d 302]; see, also, *Gibson Properties Co.* v. *City of Oakland*, 12 Cal.2d 291, 297-298 [83 P.2d 942].)

▇ In addition, the court found, upon the testimony of the city's chief of police, that the construction of houses on pilings might create police problems by reason of the possible use of the areas under the residences for immoral purposes. Municipal ordinances tending to minimize opportunity for immoral practices in relation to other types of construction such as billboards have been held within the police power. (*Cusack* v. *City of Chicago*, 242 U.S. 526, 529 [37 S.Ct. 190, 61 L.Ed. 472].) In the light of these considerations, the zoning restriction of plaintiffs' property for beach recreational purposes appears to be a legitimate exercise of the city's police power in the interests of public health, safety, morals and general welfare. ▇ Where substantial reason exists to support the determination of the city council in matters of opinion or policy affecting zoning plans, and the propriety of the districting classification is "fairly debatable" in furtherance of the community development, courts will not substitute their judgment for that of the municipal authority. (*Lockard* v. *City of Los Angeles, supra,* 33 Cal.2d 453, 462.)

▇ The fact that plaintiffs may suffer some financial detriment does not require invalidation of the zoning restriction, for "every exercise of the police power is apt to affect adversely the property interest of somebody." (*Zahn* v. *Board of Public Works*, 195 Cal. 497, 512 [234 P. 388].) As was said in *Wilkins* v. *City of San Bernardino, supra,* 29 Cal.2d 332, at page 338: "It is implicit in the theory of police power that an individual cannot complain of incidental injury, if the power is exercised for proper purposes of public health, safety, morals and general welfare, and if there is no arbitrary and unreasonable application in the particular case." While plaintiffs recognize that some value incident to property must yield to the police power, they argue that the zoning restriction as applied to their beach land goes beyond mere regulation and constitutes an unwarranted interference with the

use of their property so as to exceed the scope of permissible zoning. They cite in particular the case of *Pennsylvania Coal Co.* v. *Mahon,* 260 U.S. 393, 413 [43 S.Ct. 158, 67 L.Ed. 322]. But as there stated, "the question depends upon the particular facts." That was an action between two private parties, the statute involved admittedly destroyed previously existing rights of property and contract as reserved between the parties, and the propriety of the statute's prohibition upon the single valuable use of the property for coal-mining operations was considered in relation to special·benefits to be gained by an individual rather than by the whole community. In those circumstances application of the statute to the property was held to effect such diminution in its value as to be unconstitutional and beyond the legitimate scope of the police power.

Factually dissimilar cases cannot avail plaintiffs in their attack upon the zoning restriction upon due process grounds. Typical of such cited cases is *Panhandle Eastern Pipe Line Co.* v. *State Highway Com.,* 294 U.S. 613 [55 S.Ct. 563, 79 L.Ed. 1090], where the state in the purported exercise of its police power attempted to have a private property owner make at its own expense changes in structural improvements for public safety in travel upon the highway. It was held that such changes could be required of the property owner only upon the payment of compensation—a principle of decision well recognized in relation to the exercise of the police power within constitutional limits. (*City of Oakland* v. *Schenck,* 197 Cal. 456, 461 [241 P. 545].)

Here plaintiffs produced no evidence of value relative to the use of their property either before or after passage of the 1941 ordinance. Admittedly they have been paying substantial taxes on their property. Prior to the 1941 ordinance and while the property was zoned for residential use, plaintiffs claimed that it could not be so utilized profitably and they then unsuccessfully sought a rezoning for business purposes. Since 1941, with the zoning limitation upon their property as a beach district and subject to commercial operation for beach recreational purposes, plaintiffs have still made no use of their property as authorized but seek its return to residential classification, a districting which they had previously deemed undesirable. Now they maintain that the 1941 restriction effects a confiscatory taking of their property but they have made no showing that their beach frontage could

not be put to beneficial use in conformity with the zoning limitation. The city's planning expert expressly testified that plaintiffs' property was zoned for beach instead of residential use so as to give "the owners . . . the right to derive an income" therefrom. So distinguishable are cases cited by plaintiffs where the relative value in respective uses of the zoned property were shown (*e.g. Long* v. *City of Highland Park,* 329 Mich. 146 [45 N.W.2d 10, 12]; *State ex rel. Tingley* v. *Gurda,* 209 Wis. 63 [243 N.W. 317, 320]; where changed conditions rendered previous zoning limitations unsuitable (*e.g. Arverne Bay Const. Co.* v. *Thatcher,* 278 N.Y. 222 [15 N.E.2d 587, 591-592, 117 A.L.R. 1110]; *Skalko* v. *City of Sunnyvale,* 14 Cal.2d 213, 216 [93 P.2d 93]; where "spot" zoning created an "island" in the middle of a larger area devoted to other uses (*e.g. Maxwell* v. *Incorporated Village of Rockville Centre,* 84 N.Y.S.2d 544, 545-546; *Reynolds* v. *Barrett,* 12 Cal.2d 244, 251 [83 P.2d 29]; where the zoning restriction deprived the property owner of all beneficial or profitable use of the property (*e.g. Eaton* v. *Sweeney,* 257 N.Y. 176 [177 N.E. 412, 414].)

Plaintiffs refer to McCarthy's above-mentioned letter to the city council in the summer of 1940 advising of the public destruction of the fence they were attempting to build on their property. They contend that the city was thereby put on notice that plaintiffs could not successfully maintain any fence around their beach property and charge a fee for its use for recreational activities because of the threat of "mob violence." But that alleged destruction occurred when plaintiffs' property was zoned for residential use and more than a year prior to the enactment of the 1941 ordinance. The city's liability for such damage is fixed by statute (Gov. Code, § 50140), subject to the one-year period of limitations for commencement of the action (*Ibid,* § 50141). But in any event such act of mob violence, so remote in point of time, is not germane to the issue of reasonable zoning of plaintiffs' property under the 1941 ordinance, and it must be presumed that the city could perform its duty in affording police protection to safeguard plaintiffs' property. The physical facts and surrounding circumstances, not the possible action of unidentified third persons, provide the test for determining the validity of zoning regulations. (*Lockard* v. *City of Los Angeles, supra,* 33 Cal.2d 453, 461; *Clemons* v. *City of Los Angeles, supra,* 36 Cal.2d 95, 100.)

The trial court properly disregarded plaintiffs' contention that the 1941 zoning restriction of their property was not made in good faith but was a maladministration of the city's police power pursuant to a scheme or plan of action to depress the value of plaintiffs' beach property so that it could eventually be acquired by the public authorities at the lowest price possible, and meanwhile be used for public recreational purposes. The record simply shows that following the 1938 determination of the city's quiet title action in favor of plaintiffs' predecessors in interest in the beach property (*Manhattan Beach* v. *Cortelyou, supra,* 10 Cal.2d 653), plaintiffs and the city endeavored together—through extended informal negotiations evidenced by the city council's resolutions and the interchange of voluminous correspondence—to interest the public authorities in the purchase of plaintiffs' land for permanent beach recreational purposes; that in 1940 plaintiffs sought an amendment of the ordinance then zoning their property for residential purposes, so as to permit some business use thereon and said request, after public hearings, was denied; that in 1941 the zoning ordinance in question was passed, restricting plaintiffs' property to beach recreational purposes pursuant to an overall city-wide zoning plan, but permitting commercial use to be made of plaintiffs' property according to the zoning limitation; that thereafter, and for nine years, plaintiffs made no attempt to use their property so as to derive any income pursuant to the purposes authorized by the 1941 ordinance but the city and plaintiffs still continued to negotiate and work together in an effort to further public acquisition of plaintiffs' property; that in November, 1950, plaintiffs made their first move in objection to the zoning restriction, when they sought its modification to permit residential construction thereon though they had previously been dissatisfied with such residential limitation and wanted the property available for business use; and then upon the denial of their request in early 1951, plaintiffs brought this declaratory relief action. While plaintiffs charge that the "scheme" was initiated shortly after the city lost its quiet title action and included the state's condemnation suit brought 10 years later in 1948 (and still pending), plaintiffs did not call one city official to the witness stand to testify on the matter. (See *Safeway Stores* v. *City Council, San Mateo, supra,* 86 Cal.App.2d 277, 287.) The only evidence, except physical facts, as to the purpose of the 1941 zoning restric-

tion, was the above-mentioned testimony of the city's planning experts, attesting to the adoption of the city-wide zoning plan in the interest of the general welfare. The trial court, in its comments upon the evidence and plaintiffs' specific charges, determined that the city council had not been actuated by any improper motive or intent in the matter.

Plaintiffs' claims are entirely immaterial in view of the settled rule that "the purpose or motive of the city officials in passing an ordinance is irrelevant to any inquiry concerning the reasonableness of the ordinance. . . . If the conditions justify the enactment of the ordinance, the motives prompting its enactment are of no consequence. If the conditions do not justify the enactment, the inquiry as to motive becomes useless. . . ." (*Sunny Slope Water Co.* v. *City of Pasadena,* 1 Cal.2d 87, 99 [33 P.2d 672].) The cases which plaintiffs cite as example of the maladministration of the police power involve factual dissimilarities, which render them inapplicable here: *Grand River Dam Authority* v. *Grand-Hydro,* 200 Okla. 157 [201 P.2d 225], where the state passed an act removing the principal value of the property and then sought to "acquire the property by condemnation, basing the reimbursement to the owner on the reduced value" (p. 228); *State ex rel. Tingley* v. *Gurda, supra,* 209 Wis. 63 [243 N.W. 317]; *Grand Trunk Western R. Co.* v. *City of Detroit,* 326 Mich. 387 [40 N.W.2d 195]; and *Long* v. *City of Highland Park, supra,* 329 Mich. 46 [45 N.W.2d 10], where the ordinance effected "spot" zoning and there was evidence showing significant relative value differentiations in use of the property; and *Dobbins* v. *Los Angeles,* 195 U.S. 223 [25 S.Ct. 18, 49 L.Ed. 169], where a private citizen was led in good faith to make large expenditures on certain property pursuant to the terms of an ordinance and thereafter, without change in existing conditions within the city, a second ordinance was passed prohibiting the previously authorized use, thereby destroying a considerable property investment.

Plaintiffs also argue the error of several rulings of the trial court in the rejection of evidence. The first concerns certain testimony of Mr. McCarthy relative to conversations had with city officials and offered in support of plaintiffs' claim of improper motive on the part of the city council in its adoption of the 1941 zoning restriction on plaintiffs' property. Objection to this testimony was properly sustained. The assigned motive or purpose of various city

officials in passing a zoning ordinance was irrelevant to any inquiry concerning its reasonableness in municipal over-all planning. (*Sunny Slope Water Co.* v. *City of Pasadena, supra,* 1 Cal.2d 87, 99.)

Plaintiffs next assert that the trial court committed prejudicial error in rejecting certain expert testimony relative to the suitability of plaintiffs' property for subdivision for residential purposes. But such testimony had only cumulative value in that its admission would have added nothing to what was already before the court through Colonel Leeds' statements as to the feasibility of the residential development of the beach property and his proposed plan. There was no dispute that plaintiffs' property could be so subdivided and the court recognized that fact after viewing the premises. Under the circumstances plaintiffs suffered no prejudice from the ruling.

Plaintiffs finally argue the point of the trial court's disposition of McCarthy's above-mentioned letter of July, 1940, notifying the city of the public destruction of the fence which was being erected on the property. The record shows some confusion on this phase of the case. This letter, upon objection, was originally rejected by the trial court but marked for identification. Then later in the trial when McCarthy testified as to the particular acts of "mob violence" experienced more than a year before the 1941 zoning regulation was adopted, the trial court commented that his testimony was "related in the document that is in evidence (the letter)." As aforestated, possible damage to plaintiffs' property through mob violence and the city's liability therefor are matters wholly covered by statute (Gov. Code, §§ 50140-50141) and not germane to the issue of reasonableness of the zoning process in city-wide planning. But regardless of this consideration, the trial court apparently treated the particular letter as in evidence, corroborating McCarthy's testimony, and plaintiffs now have no ground for complaint.

As the record has been reviewed, the zoning restriction of the 1941 ordinance (§ 10) on the use of plaintiffs' property appears to be a fair, just and reasonable regulation for the general welfare of the city as a whole, and not so burdensome that it contravenes the constitutional guarantees in protection of property rights. (See *City of Miami Beach*

v. *Hogan* (1953), —— Fla. —— [63 So.2d 493, 494-495].'
The judgment is affirmed.

Edmonds, J., and Traynor, J., concurred.

CARTER, J.—I concur in the judgment of affirmance because I can see no escape from the proposition that the record in this case presents a factual situation as to the reasonableness of the ordinance here in question upon which reasonable minds might differ. Such being the case it cannot fairly or honestly be said as a matter of law that as applied to plaintiff's property the ordinance is so unreasonable as to constitute an arbitrary and unconstitutional exercise of the police power by the defendant.

I have heretofore given expression to my views with respect to the validity of zoning ordinances enacted by city councils and boards of supervisors which arbitrarily and unreasonably limit and restrict the use of private property under the guise that such limitation and restriction constitute a reasonable exercise of the police power. See *County of San Diego* v. *McClurken,* 37 Cal.2d 683, 692 [234 P.2d 972]; *Clemons* v. *City of Los Angeles,* 36 Cal.2d 95, 107 [222 P.2d 439]; *Ayres* v. *City Council of Los Angeles,* 34 Cal.2d 31, 43 [207 P.2d 1, 11 A.L.R.2d 503]; *Lockard* v. *City of Los Angeles,* 33 Cal.2d 453, 468 [202 P.2d 38, 7 A.L.R.2d 990]; *Wilkins* v. *City of San Bernardino,* 29 Cal.2d 332, 345 [171 P.2d 542].

In the McClurken, Lockard and Wilkins cases, *supra,* the trial court had held the zoning ordinance in each of said cases unconstitutional as applied to the property there involved and this court by a bare majority reversed the trial court notwithstanding the record contained overwhelming evidence that the ordinance in each of said cases was so arbitrary and unreasonable as to seriously impair the value of the property affected by the ordinance. In the Wilkins case the trial judge viewed the premises. This is likewise true in the case at bar. It has been repeatedly held that the observations of a trial judge in viewing the premises or scene of the controversy is evidence in the case upon which findings may be based (*Neel* v. *Mannings, Inc.,* 19 Cal.2d 647 [122 P.2d 576]; *Gates* v. *McKinnon,* 18 Cal.2d 179 [114 P.2d 576]; *Ethel D. Co.* v. *Industrial Acc. Com.,* 219 Cal. 699 [28 P.2d 919]; *People* v. *Milner,* 122 Cal. 171 [54 P. 833]; *Gastine* v. *Ewing,* 65 Cal.App.2d 131 [150 P.2d 266];

*MacPherson* v. *West Coast Transit Co.,* 94 Cal.App. 463 [271 P. 509] ; *Vaughan* v. *County of Tulare,* 56 Cal.App. 621 [205 P. 21] ).

Notwithstanding this circumstance a bare majority of this court held that the findings that the enforcement of the ordinance would be oppressive, confiscatory and an unreasonable restriction on plaintiff's property rights were not supported by the evidence.

At page 352 of my dissent in the Wilkins case, *supra,* I stated: ''The effect of the majority opinion in this case is to commit to the legislative body the solution of all questions of both fact and law which arise when a zoning ordinance is attacked for unreasonableness in its application to certain property unjustly affected thereby. This is contrary to the rule which has been uniformly followed in the prior decisions of this court hereinabove cited and discussed. The decision of the trial court is in accord with these decisions and should therefore be affirmed.'' In the Lockard case, *supra,* the majority of this court stated at page 462: ''The findings and conclusions of the trial court as to the reasonableness of a zoning ordinance are not binding on an appellate court if the record shows that the question is debatable and that there may be a difference of opinion on the subject. The appellate courts looks beyond such determinations and consider in some detail the basic physical facts appearing in the record, such as the character of the property of the objecting parties, the nature of the surrounding territory, the use to which each has been put, recent trends of development, etc., to ascertain whether the reasonableness of the ordinance is fairly debatable.'' In my dissent in that case I stated at page 473: ''In essence, what the majority opinion holds is this: That the validity of such an ordinance depends upon whether four members of this court think it is reasonable as applied to plaintiffs' property, they being the judges of both fact and law. Such being the case, the function of the trial court is that of a mere referee to hear the evidence and make his recommendation which has no binding effect as a factual determination. This is indeed a new and unique legal philosophy of law without constitutional or statutory postulate.''

In every zoning case which has come before this court since I have been a member of it, I have taken the position that the law should be that the determination of the reasonableness of zoning ordinances as applied to private property is a

question of fact to be determined by the trial court and if its determination is supported by sufficient competent evidence, such determination is binding upon an appellate court the same as in other cases where factual situations are involved. It has been my position that under the Constitution and laws of this state, fact finding powers are reposed in juries and trial judges and that where factual determinations are made by juries and trial judges upon sufficient competent evidence and no error has been committed prejudicial to the party against whom such determination is made, the appellate courts of this state are bound by such determinations as such courts have no fact finding powers and their only function is to determine issues of law; that an issue of fact becomes an issue of law only where no fact is left in doubt, and no deduction or inference can be drawn in support of an issue that the court can say, as a matter of law, that the issue has not been established. And even where the facts are undisputed, if reasonable minds might draw different conclusions from the evidence the issue is one of fact to be determined by the trier of fact. This is the traditional rule which has been followed by this court since its institution in 1850 with the exception of the past two or three years when this court has assumed the role of a fact finding tribunal both in zoning ordinance cases and many other cases (see dissenting opinion in *Gray* v. *Brinkerhoff* decided June 30, 1953, *ante*, pp. 180, 186 [258 P.2d 834]).

As stated at the beginning of this opinion the record in this case presents a factual situation as to the reasonableness of the ordinance here involved, as applied to plaintiffs' property, upon which reasonable minds might differ, the trial judge viewed the premises and made findings to the effect that the ordinance as applied to plaintiffs' property was and is reasonable. In view of this state of the record and the law as it has been declared by this court, I can see no escape from the affirmance of the judgment.

SCHAUER, J.—I dissent. In my view the opinion of the District Court of Appeal, authored by Justice Parker Wood and concurred in by Presiding Justice Shinn and Justice Vallée (reported in 257 P.2d 679-690), adequately discusses and correctly resolves all issues of law presented on this appeal.

From 1923 to June 26, 1941 (when ordinance No. 502 was passed), plaintiff's property was zoned as residential prop-

erty. Not until after the city failed in an attempt to quiet title to the property, and in efforts to purchase it, extending over several years, did the city, in 1941, pass ordinance 502, thereby zoning the property so as to limit it to beach recreation activities and cause it to remain available for public use without requiring the public or any public body to expend any money therefor, and to remain without income to plaintiffs but subject to some $9,000 in annual taxes. At the time this action was commenced plaintiffs' was the only privately owned property falling within the beach recreation zone (B-1). Moreover, the city had failed to provide plaintiffs with police protection to avoid destruction of a fence designed to protect the property from the encroaching public. These circumstances appear to me to constitute a clear and deliberate taking of the property for public use without the payment of compensation therefor.

Such taking of private property without compensation, as effected in this case, appears to me to go beyond any reasonable application of the police power of a constitutional state which would maintain capitalism as the foundation of its institutions. Capitalism is not to be ashamed of or whittled away. It encompasses the economic system which has brought our country to world leadership. It denotes a way of living in society and of having dealings with others for reciprocal benefits and with mutual gain; it thrives on free enterprise and competition; and it furnishes incentive to be diligent, efficient and thrifty. It means that a man is free, not a slave; that he alone or collectively with others may bargain for his labor and receive and possess the price thereof; that he alone or collectively with others may invest his earnings in real or other property; and that in either event he shall be protected in his right to work and in the ownership and enjoyment of his wealth.

The fact that a particular property is desirable for the public use does not make its private ownership unlawful or warrant using the power of government to destroy its value. Our Constitution envisages a taking for public use in all proper cases but it no more permits to the state a taking without paying fair compensation than it does to an individual. As between the state and an individual our first concern always should be to guard the rights of the individual, not to build up the power of the state. Under my view of constitutional American procedures the state, when it takes private property for the public use, must, if purchase for a

fair price cannot be negotiated, proceed under the power of eminent domain, condemn the property desired, and pay the reasonable value as fixed by a jury. Taking the property as is here done does not appear to me to be encompassed within a reasonable exercise of police power by a constitutional state; it smacks more of calculated and arbitrary confiscation by a police state. Besides all that, I should like to think that the scheme here resorted to was beneath the honor of a self respecting American municipality.

For the reasons more fully developed in the able opinion of Mr. Justice Wood, above referred to, I would reverse the judgment.

SHENK, J.—I dissent. I agree with the District Court of Appeal of the Second Appellate District, Division 3, and would reverse the judgment for the reasons stated by that court in its opinion reported in volume 257 of the Pacific Reporter at pages 679-690, inclusive.

Appellants' petition for a rehearing was denied January 27, 1954. Shenk, J., and Schauer, J., were of the opinion that the petition should be granted.