[L. A. Nos. 13194, 14004. In Bank.—May 31, 1934.]

SUNNY SLOPE WATER COMPANY (a Corporation), Respondent, v. CITY OF PASADENA (a Municipal Corporation) et al., Appellants.

88

Harold P. Huls, City Attorney, and John W. Holmes, Deputy City Attorney, for Appellants.

Woodruff, Burr & Smith for Respondent.

THE COURT.—The City of Pasadena and certain of the city officials appeal from a judgment determining that a

certain zoning ordinance and a so-called boiler ordinance of the City of Pasadena are inapplicable to respondent, and also appeal from the order taxing costs. The facts giving rise to the controversy are as follows:

Since 1895 the respondent Sunny Slope Water Company has been engaged in the business of owning, developing and acquiring water, water rights and waterworks, and in distributing water at cost to its stockholders in a territory embracing some 2,282 acres. For many years respondent company has owned the underground water rights to and the right to drill for water on a certain 160 acres, which area, until 1930, was entirely outside the city limits of the City of Pasadena, and adjacent to the southeast boundary of that city. Arthur and Sedenia Richards, not parties to this proceeding, are the owners of the surface rights to a certain lot designated as lot nine, which lot is located within this 160 acres. It is conceded that the Richards acquired their title to lot nine subject to and with the full knowledge of the rights of respondent company. In December, 1929, respondent company notified Richards of its intention to drill a well and locate a pumping plant on lot nine, pursuant to its admitted rights. On February 14, 1930, respondent company commenced the drilling of a 24-inch well on lot nine and continued its operations until March 20, 1930, when the casing in the well collapsed. In the meantime Richards and other property owners in the vicinity approached certain officials of the City of Pasadena with the suggestion that a portion of the 160 acres above mentioned should be annexed to the city. Pursuant to the method provided by law, a portion of the 160 acres, consisting of 30 acres and known as Lombardy annex, on March 8, 1930, was annexed to the City of Pasadena. Included within this 30 acres was lot nine, owned by Richards. The annexation was accomplished by the affirmative vote of three of the four qualified voters in the area.

After the collapse of the contemplated well on March 20, 1930, and after the annexation had been completed, respondent company desired to drill a new well about 50 feet south of the collapsed well. The site of this proposed well was also on the Richards property. Respondent's contractor, on May 20, 1930, applied to the city manager of the

City of Pasadena for a permit to resume operations with a steam engine, boiler and well rig. This permit was requested under the so-called boiler ordinance of the City of Pasadena. This ordinance had been passed in 1928 and provided that it shall be unlawful to install, set up or commence the operation of any steam boiler unless a permit be first obtained. It is conceded that the request for a permit was in proper form. The city manager denied the request, but did issue a limited permit for the purpose of allowing respondent's contractor to set up necessary machinery to remove the casing from the collapsed well. Respondent company then submitted its request for a permit to drill the new well directly to the board of directors of the city, but that board likewise denied the request. The request for a permit was renewed on several occasions, but each time was denied. Respondent company offered to construct its pump-house underground, to sound-proof the pump-house, and to landscape the area. The city officials, however, refused to grant the permit. This action was then commenced on July 10, 1930. On July 22, 1930, the general zoning ordinance of the City of Pasadena was duly and properly amended in the manner provided by law, so as to place Lombardy annex within "Zone E", as defined in the ordinance, said zone being the most highly restricted residential zone, all commercial uses being prohibited therein. It is conceded that in 1929 the City of Pasadena was and now is actively engaged in the production, distribution and sale of water to its customers in the City of Pasadena and county of Los Angeles. The purpose of this action was to have the boiler and zoning ordinances declared inoperative as to respondent company. The trial court found in favor of respondent and the city and its officers appeal.

The findings of the trial court are voluminous. No useful purpose would be served by reviewing them in detail. So far as necessary for the purposes of this appeal, in addition to the above facts, the trial court found that if a permit had been issued under the boiler ordinance, it would not endanger the life, health or property of the citizens of the city, and that the refusal of the city manager and board of directors to grant the permit was, under the facts, arbitrary and unreasonable. The zoning ordinance was likewise found

to be, as to respondent, inapplicable and discriminatory. The court made a whole series of findings dealing with the motives and purposes of the city officials in assisting in the annexation, in denying the request for a permit, and in causing the zoning ordinance to be amended. The theme of these findings is that the city is engaged in the water business as a competitor of respondent company, and that the city desired to prevent respondent from drilling and extracting water from the Pasadena basin, which was also the source of supply of the city. It is found as a purported fact that the zoning ordinance was amended solely for the purpose of preventing respondent company from drilling the well, and was not passed to protect the public peace, health, safety, security or general welfare of the citizens. It is also found, in some detail, that the 30 acres included within Lombardy annex are largely devoted to farming and agricultural pursuits; that there are other commercial wells in the general vicinity; that the city is engaged in acquiring an extensive area adjacent to Lombardy annex for water purposes; that the city operates commercial wells belonging to it within zone E in various places in the city. By its judgment the court declared that the boiler and zoning ordinances were, as to respondent company, unreasonable, discriminatory, unconstitutional and unenforceable; ordered that the city manager issue a permit; and enjoined the city and its officials from interfering with the drilling of the well.

Before discussing the specific problems presented on this appeal, certain general observations should be made. The general validity of the zoning ordinance is conceded by all involved. Moreover, the fact that Lombardy annex was not zoned until after the application for a permit is without significance. The rights of the parties are to be determined as of the present time rather than the time of the application for a permit. By its application for a permit before the zoning ordinance was passed, respondent company secured no vested right to the same. (*Wheat* v. *Barrett*, 210 Cal. 193 [290 Pac. 1033]; *Brougher* v. *Board of Public Works*, 205 Cal. 426 [271 Pac. 487]; *Miller* v. *Board of Public Works*, 195 Cal. 477 [234 Pac. 381, 38 A. L. R. 1479].)

The specific question here presented is whether the zoning ordinance, generally valid, is void as to respondent company, because of the facts shown by the record. Before respondent can succeed in its efforts to avoid the application of the ordinance to it, it must be held that it established that the ordinance is unreasonable as to it, in the face of a strong presumption to the contrary. (*Miller* v. *Board of Public Works, supra; Euclid* v. *Ambler Realty Co.*, 272 U. S. 365 [47 Sup. Ct. 114, 71 L. Ed. 303, 54 A. L. R. 1016].)

Examining the record and the various exhibits transmitted to this court by stipulation, it appears that the main part of the City of Pasadena lies to the northwest of Lombardy annex. At the present time, the 30 acres included within the annex are largely devoted to the growth of citrus and walnut trees.

The tank of the El Campo Water Company, a commercial water company, is located near the proposed well of respondent company, having been located there for over 20 years, and a high tension power line carrying 220,000 volts runs through the area. The evidence shows that power lines of equal power transverse many high-class residential areas.

There are several high-class residences close to the proposed well site. Within a circle with a quarter mile radius the proposed well being the center, there are 18 residences, mostly of a high-class character, some with from 21 to 28 rooms. There are 88 residences within a half mile radius of the proposed well site. The city of San Marino lies westerly of Lombardy annex, and the area there included is high-class residential. There are several improved streets running through or along the boundaries of the annex. The only commercial development, near by, in addition to the growing of citrus and walnut trees, consists of the El Campo well and the power lines already mentioned; another well of the respondent company located outside the city limits; and the city's wells above referred to. The portions of the City of Pasadena contiguous to the annex are zoned as first-class residential. Eaton wash, a stream bed bordering the annex, is wooded and undeveloped. Respondent's testimony emphasizes the fact that the area is devoted to homesites with large grounds, with orchards surrounding them. There can be little doubt, from a reading of the record, that Lom-

bardy annex is now a region characterized by citrus and walnut groves, and recently turned to development as a large lot residential tract. The annex stands directly in the path of the future residential development of San Marino and the City of Pasadena. ▉ The density of population cannot possibly be held to be the conclusive test. The determination that commercial uses should be entirely excluded from certain areas is primarily a matter of legislative concern. Such legislation is not only based on existing conditions, but also looks to the future. As was said by this court in *Jones* v. *City of Los Angeles,* 211 Cal. 304, 308 [295 Pac. 14]: ''It cannot be seriously contended that relative density of population in the permissive and restricted districts is a controlling test of the validity of a zoning plan, so far as the claim of discriminatory classification is concerned. The object of the present ordinance is to exclude hospitals for the treatment of insanity and nervous diseases from those districts which are devoted to residential purposes, because it is in such districts that they adversely affect the public welfare. This being so, it is immaterial whether the restricted district is densely or sparsely populated, if it is residential. The ordinance is concerned with the nature of the district. A growing residential area is as reasonable an object of protection as one which is fully built up. On the other hand, while the permitted districts include some territory which is densely populated, that territory is not residential in character. It is devoted to business purposes and hence requires none of the special regulation deemed desirable to foster and protect the development of homes and the maintenance of a proper environment for children. Moreover, the argument of plaintiffs, carried to its logical conclusion, would destroy the usefulness of zoning ordinances, as an effective means of city planning, for it would require an examination of the regulation solely on the basis of present conditions. But zoning legislation looks to the future. It is a constructive movement in municipal legislation and, as such, it has received the approval of our courts.''

In *Ex parte Hadacheck,* 165 Cal. 416, 420 [132 Pac. 584, L. R. A. 1916B, 1248], the rule is stated as follows: ''Whether or not this trade, however strictly the manner

of its conduct may be regulated, can be pursued at all in a residential district without causing undue annoyance to persons living in the district, is certainly a question upon which reasonable minds may differ. If this be so, the propriety of entirely prohibiting the occupation within such districts is one for the legislative determination. The courts will not substitute their judgment upon this issue for that of the legislative body.''

Of course, zoning ordinances, or ordinances excluding any commercial use, must be reasonable, and the use excluded must bear some reasonable relation to the public interest. But, as indicated from the above quotations, where reasonable minds may differ as to the propriety of the classification, the legislative determination is conclusive. The principle is quite clearly stated in *Marblehead Land Co.* v. *City of Los Angeles*, 47 Fed. (2d) 528, 532, as follows: ''The legislative body intrusted with the police power has a wide discretion which cannot be interfered with by the courts. Their laws or ordinances enacted in pursuance of the police power are invested with a strong presumption of validity. If the question as to whether or not the legislation is unreasonable or arbitrary or an unequal exercise of power is fairly debatable, the legislation must be upheld as valid.''

It is quite clear that a commercial water well and pumping plant is a commercial use and may quite properly be excluded from a residence zone. The problem is the same in principle as that involved in the Marblehead Land Company case above referred to. In that case it was contended that the city of Los Angeles acted unreasonably in zoning an area for residential purposes, consisting largely of unimproved land, and thereby excluding the plaintiff's proposed use for the production of oil and gas. The plaintiff had invested $136,000 in the area in the anticipation of its proposed use at a time when such use was permitted. Later the area was rezoned for residential purposes. In holding the ordinance valid, the Circuit Court of Appeals for the Ninth Circuit stated:

''In view of the surroundings of the appellant's property, the fact that it is in the line of development of the residential district of Los Angeles, that expensive dwellings had

already been erected in the neighborhood, that adjacent property has been improved by opening streets and paving and sidewalking the same, there would seem to be little doubt of the right of the city under zoning ordinance to prevent the use of appellants' property for industrial and manufacturing plants or erection of gas works, which would be entirely out of harmony with the development of the neighborhood.

"The situation disclosed by this record, however, does not deal primarily with the right to improve appellants' property by the erection of buildings thereon, but rather with the right of the owner to produce from the soil the minerals therein contained. . . . If there is any difference between the taking of the unearned increment by zoning ordinances and the taking of the inherent value of the soil or its contents, it arises from the fact that it might be deemed unreasonable to prevent a man from developing natural gas upon his property and reasonable to prohibit the erection of gas works, because in the former case gas works can be erected in other suitable zones or districts in the city, while in the case of natural gas it must be reproduced from the land in which it exists. It might therefore be held that an ordinance is reasonable where it requires the establishment of gas works or oil refineries in a certain zone and prohibited in others, and might be unreasonable and therefore void because it prohibited an owner from producing natural gas from the land in which it was located. In either event, however, there can be no question of the inherent right of the city to control or prohibit such production, provided it is done reasonably and not arbitrarily. In that event the loss must fall upon the owner whether it prevents him from erecting structures or establishing industries which he desires to erect or establish, or whether it prevents him from developing the inherent potentialities of his land."

The United States Supreme Court denied a petition for a writ of *certiorari* in this case. (284 U. S. 634 [52 Sup. Ct. 18, 76 L. Ed. 540].)

The precise question involved on the instant appeal has been recently decided adversely to respondents by the District Court of Appeal in *City of South Pasadena* v. *City of San Gabriel,* 134 Cal. App. 403 [25 Pac. (2d) 516], in

which case this court denied a hearing, and in which the United States Supreme Court has recently dismissed the appeal and denied *certiorari*. In that case the city of South Pasadena purchased a tract of land in the city of San Gabriel for the purpose of drilling a water well thereon. South Pasadena contemplated using the well to supplement its water supply. The city of San Gabriel had an ordinance somewhat similar to the boiler ordinance here involved, prohibiting the drilling of a well without a permit. Apparently no zoning ordinance was involved. The city of South Pasadena requested a permit, which request was refused, whereupon that city sought by mandate to compel its issuance. There are some factual differences between this and the instant case, but on the whole the factual situations involved are remarkably similar. The action of the city officials in denying the permit was upheld. In so doing, the Appellate Court stated:

"It is contended by South Pasadena that ordinance 197 is invalid because it confers arbitrary and uncontrolled powers over the disposition of petitions for permits to drill for water. It is said that where a business is lawful, and permits for its inauguration are required, an ordinance providing the requirement must contain rules and regulations to be followed by the officer or officers who consider applications for permits. This is indeed the rule as to businesses which cannot work harm to the morals, health or general welfare of the city in which it is to be inaugurated, or to citizens in its proposed neighborhood. But the rule is different where the business, although perfectly lawful in character, may work such harm in its conduct. In such instances the granting or refusing of a permit to operate the business may be confided to the reasonable and proper discretion of an officer or officers, without the imposition of rules to regulate or guide their actions. (*Gaylord* v. *Pasadena*, [175 Cal. 433 (166 Pac. 348)] *supra; In re Holmes*, 187 Cal. 640 [203 Pac. 398]; *Parker* v. *Colburn*, 196 Cal. 169 [236 Pac. 921].) We think we may take judicial notice that the drilling for water and the consequent use of the water thereby developed, together with the employment and maintenance of such agencies as may naturally conduce to such use, might under certain circum-

stances and in certain portions of the territory of San Gabriel, or of any other city, be detrimental to the health, comfort or welfare of its inhabitants.''

After discussing the nature of the district where the proposed well was located, the court continued:

''It may be true that the district in question here is partially subjected to horticultural and agricultural pursuits in the same manner as are some parts of rural territory, but it is nevertheless urban and not semi-rural. That is settled by the fact that it lies within the territorial limits of San Gabriel. As a part of the city, and considering its condition at the time the evidence was taken in the trial court, as well as its adaptability for further settlement and improvement as a residence district, it is entitled, together with the remainder of San Gabriel, to be protected from the invasion of business establishments which, however lawful, are yet susceptible of a manner of operation injurious to the health, comfort or general welfare of its inhabitants.''

The court concluded with the following observations:

''South Pasadena attempts to make much of the fact that in the operation of its water plant it is engaged in the discharge of a sacred trust in behalf of the beneficiaries thereof, the people of the portion of the city which is served from the water system. It is contended, in effect, that because of this circumstance South Pasadena was entitled to special consideration at the hands of the city council of San Gabriel when the former city asked for the permit we have so often mentioned. We think the circumstance leads to the contrary conclusion. San Gabriel, too, is engaged in the administration of a trust, that of protecting its people from dangers to their health, comfort and general welfare. San Gabriel is not concerned with the trust with which South Pasadena burdened itself when it embarked in the conduct of the water business, if the execution of the latter trust improperly impinges upon the rights of the people of San Gabriel. When South Pasadena asked the permit from the city council of San Gabriel, no matter how honestly that request was made, no matter how badly South Pasadena required an augmentation of its water supply, the latter city asked too much. Under the law South Pasadena could not levy such a tribute upon San Gabriel as would have been

paid if the permit had been granted. To grant the permit would have been to impose upon San Gabriel no inconsiderable portion of the burden which rests upon South Pasadena as a purveyor of water to a portion of its territory. The city council of San Gabriel was amply justified in refusing the permit.

"At the back of the above discussion lies the rule that official duty is presumed to have been correctly performed, as well as the rule that where, in such instances as that which presented itself to the city council of San Gabriel, there is a question upon which minds may differ—a conflict of evidence—the decision of the body concerned cannot be disturbed. But there is little reason to invoke these rules, after all, as we fail to perceive how the city council of San Gabriel could properly have granted the requested permit."

■ The reasoning of that case is equally applicable here. Of course, this court recognizes that the drilling for water and the serving of it to the public is a very important commercial enterprise. We are not here presented with a situation where the only water-bearing area available for respondent's purposes has been zoned for residential purposes. Such a situation would present questions not involved on this appeal. Each case must be determined on its own merits. In the instant case, the evidence shows that respondent owns the underground water rights to 130 acres of land adjoining Lombardy annex, outside the city limits, on which it may drill water wells. The evidence is quite clear that the major portion of the entire 160 acres overlies the same supply of underground water.

■ Respondent emphasizes the fact that the city is also engaged in the water business and owns and operates wells and pumps in the restricted area in other portions of the city. Most of these wells antedated the zoning ordinance, but even as to the new wells it is quite clear that the city is not bound by its zoning ordinance. (*C. J. Kubach Co.* v. *McGuire,* 199 Cal. 215 [248 Pac. 676]; *Balthasar* v. *Pacific Electric Co.,* 187 Cal. 302 [202 Pac. 37, 19 A. L. R. 452].)

■ As already stated, the trial court made extensive findings in reference to the alleged motives and purposes of certain city officials in assisting Richards and the other property owners in Lombardy annex in working out the

details of the annexation, in denying the permit and in passing the amendment to the zoning ordinance. The findings in effect declare that because of the activity of certain city officials in these matters the annexation was consummated, the permit denied, and the amendment to the zoning ordinance passed with some evil motive.. As far as the zoning ordinance is concerned, none of these activities was connected up with the legislative board of the city, the board of directors. In any event, all these findings, falling, as these do, far short of charging actual fraud, are entirely immaterial. It is well settled that the purpose or motive of the city officials in passing an ordinance is irrelevant to any inquiry concerning the reasonableness of the ordinance. In the case of *In re Smith,* 143 Cal. 368, 373 [77 Pac. 180], this court stated the rule as follows:

" . . . as it must happen in the case of many of these ordinances that the unreasonableness and oppression is not apparent upon the face thereof, evidence in such cases will be admitted to show the existing conditions. But this evidence will not go to motive. If the conditions justify the enactment of the ordinance, the motives prompting its enactment are of no consequence. If the conditions do not justify the enactment, the inquiry as to motive becomes useless. This is but in accordance with the well-settled rule, and for that reason the allegations touching the motive of the board of supervisors in passing the ordinance here under consideration have been and are entirely disregarded.''

In *Soon Hing* v. *Crowley,* 113 U. S. 703 [5 Sup. Ct. 730, 28 L. Ed. 1145], the United States Supreme Court states the reason for the rule as follows:

''Their motives, considered as the moral inducements for their votes, will vary with the different members of the legislative body. The diverse character of such motives, and the impossibility of penetrating into the hearts of men and ascertaining the truth, precludes all such inquiries as impracticable and futile.''

See, also, *Ex parte Yung,* 7 Cal. App. 440 [94 Pac. 594]; *State* v. *Superior Court,* 155 Wash. 244 [284 Pac. 93].

Appellants also appeal from the order taxing costs. The only item complained of is the cost of a day by day transcript. The parties had stipulated that a daily transcript

should be prepared and, in case of an appeal, the daily transcript could be used. Nothing was said in the stipulation as to who should pay for the transcript or whether it could properly be included in the cost bill by the winning party. As far as the record shows, when this stipulation was stated to the trial court, no remark of any kind was made by him. Respondent contends, however, that the trial judge said ''Very well.'' It is not contended that any order in reference to the daily transcript was made by the trial court other than this observation. Such statement falls far short of an order requiring the preparation of a daily transcript. The right to recover costs is purely statutory and it is only when the trial court has ordered the transcript to be prepared that the statute (sec. 274, Code Civ. Proc.) allows the cost thereof to be recovered. (See *Senior* v. *Anderson*, 130 Cal. 290 [62 Pac. 563]; *City of Los Angeles* v. *Pomeroy*, 124 Cal. 597 [57 Pac. 585].)

For the foregoing reasons, the judgment and order appealed from are and each is reversed.