IN THE MATTER OF THE APPLICATION OF HACKENSACK WATER COMPANY UNDER *R. S.* 40:55-50 FOR A DETERMINATION THAT THE ERECTION OF A CERTAIN STRUCTURE ON LANDS IN THE BOROUGH OF CARLSTADT IS REASONABLY NECESSARY FOR THE SERVICE, CONVENIENCE AND WELFARE OF THE PUBLIC.

BOROUGH OF CARLSTADT, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, APPELLANT, v. BOARD OF PUBLIC UTILITY COMMISSIONERS OF THE STATE OF NEW JERSEY AND HACKENSACK WATER COMPANY, A CORPORATION OF THE STATE OF NEW JERSEY, RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued July 2, 1956—Decided September 4, 1956.

410

Before Judges CLAPP, HALL and HEGARTY.

*Mr. Saul Sher* argued the cause for the appellant (*Messrs. Sher, Friedman and Sher,* attorneys).

*Mr. Samuel William Zerman* argued the cause for the respondent Hackensack Water Company.

The opinion of the court was delivered by

HALL, J. S. C. (temporarily assigned). This is an appeal by the Borough of Carlstadt under *R. R.* 4:88–8 to review a determination of the Board of Public Utility Commissioners

that the erection of a replacement ground water tank by respondent Hackensack Water Company on lands in the borough zoned against such use "is reasonably necessary for the service, convenience and welfare of the public."

The board's decision was rendered pursuant to the authority of *R. S.* 40:55–50, a part of the zoning enabling legislation, which reads:

"This article or any ordinance or regulation made under authority thereof, shall not apply to existing property or to buildings or structures used or to be used by public utilities in furnishing service, if upon a petition of the public utility, the board of public utility commissioners shall after a hearing, of which the municipality affected shall have notice, decide that the present or proposed situation of the building or structure in question is reasonably necessary for the service, convenience or welfare of the public."

The water company, a public utility corporation, furnishes service to consumers in some 54 municipalities in northern Hudson and Bergen Counties. Its service area in the latter county covers the entire territory bounded by the Hudson River, the New York state line, the Saddle and Passaic Rivers, and the southerly boundaries of the Boroughs of Rutherford and East Rutherford. The method of distribution used in the various sections depends on the topography, which consists of a high area along the Hudson River from the Jersey City line to the state boundary, another small high area in the southwestern corner including parts of Carlstadt and Wood-Ridge, and the remainder and great bulk of the territory lying at a very considerably lower elevation, designated as the New Milford Low Service System. Generally speaking, this large low area is supplied by pumping from the company's main station in the town of that name, operated in conjunction with impounding and distributing reservoirs located at appropriate places, and the high areas by gravity from storage tanks situate at sufficient elevation. The supply and distribution system for the entire territory is integrated.

Since before the turn of the century the company has operated, as a part of this system, a pumping station with

accompanying facilities on premises it owns at a high eleva-
tion in the Borough of Carlstadt. This is the "situation"
involved in the present proceeding. The plot of a little
over half an acre is bounded on three sides by public streets
with frontage of 200 feet on one and 125 feet on the
other two, and on the fourth by private residential property.
Located on the street lines at the northeasterly corner is
a one-story brick pumping station, 32 feet by 13 feet. To
the south thereof, close to the street line bounding the
property on the east and similarly near the line of the
private property adjoining on the south, is a steel water
tank at ground level, 20.3 feet in height, 105 feet in
diameter and holding 1,300,000 gallons. This was erected
in 1899. It occupies almost half the plot area. On the
westerly portion of the plot is an elevated steel tank, con-
structed in 1929, 100 feet in height and with a capacity
of 250,000 gallons. The greater portion of this distance
comprises an open framework of legs supporting the struc-
ture. The whole plot is fenced and landscaped.

This elevated tank supplies by gravity the high area in
Carlstadt and Wood-Ridge and the ground storage tank,
while also acting as a suction for the pumps pumping water
into the high level tank, serves more importantly to sustain
pressures and provide additional water at a high rate for
the low service system in the company's southwest area in
times of peak demand. The absence of an adequate supply
of water in such a tank for such purpose would so reduce
pressure in the low area as to practically deprive consumers
there of all water service during high consumption periods.
It is apparent that the three structures at this site are
interrelated in function, and that the installation is an
essential part of the entire system serving not only Carlstadt
but surrounding communities.

The location of the plot in question is in the midst of
the "A Residence" zone under the borough ordinance, one
block from the Wood-Ridge boundary. This zone classifica-
tion is designated for one and two-family dwellings. Carlstadt
is described as a community built to the saturation point

to the extent of land suitable for residence purposes. Its population has remained stable with little increase for the past 25 years and its character is established. The neighborhood surrounding the company installation is of good quality consisting of modest residences closely built on rather small lots for one and two-family occupancy. Most of the homes are not of recent construction. From the physical evidence it would appear that most, if not all, were built since 1899 and some since 1929. While the record does not disclose the date of adoption of the zoning ordinance, it must have been subsequent to 1929 for it is conceded that the company's present structures and operation constitute a non-conforming use.

The company proposes to replace the present ground storage tank by a larger one on the same spot, ten feet less in diameter, but 60 feet high and with a capacity of 3,200,000 gallons. It would be of solid cylindrical design and roughly twice the height of neighboring houses. There is no question but that the structure would constitute an extension of a non-conforming use prohibited by the zoning ordinance (*Borough of Rockleigh, Bergen County v. Astral Industries, Inc.,* 29 *N. J. Super.* 154 (*App. Div.* 1953)), although its height alone is not violative of the ordinance limit of 35 feet, since this requirement is expressly made inapplicable to water tanks or standpipes.

After being unable to obtain a hearing on its application for a variance to the borough board of adjustment because of continued lack of a quorum (which borough officials testified unequivocally would not have been granted even if recommended), the company instituted the present proceeding in September 1955. Parenthetically it may be observed that prior application for a variance is not a necessary prerequisite to relief under the statute. The petition alleged necessity for the new tank by reason of rapidly increasing demands for water service in the southwestern portion of the system beyond the capacity of the present installation and asserted the location in question to be the best available in view of the topography.

Its supporting proofs were introduced before the board's hearing examiner through the testimony of the president and chief engineer. They showed a population increase of about 37% in the company's entire territory during the 15 years since 1940, a corresponding 50% increase in the number of water customers and a rise of about 70% in the average daily demand, which last year reached 56,800,000 gallons. In the southwestern area comprising the communities of Carlstadt, Wood-Ridge, Rutherford and East Rutherford, during the same period the increase in population was about 18%, with a 20% rise in the number of water customers, but with an average daily demand 72% greater. Much greater stress was laid, however, on the tremendous peak demands experienced during the summer of 1955 to evidence the need for immediate expansion of facilities. On July 22, 1955 the total demand on the system reached 96,600,000 gallons, the highest in history and at a ratio of 170% to the average daily demand. Between 7:00 and 8:00 P. M. on that day the hourly demand was at the rate of 164,300,000 gallons a day, also a record and at a ratio of 289% to the average daily demand. These maximum daily and hourly demands have been steadily growing greater for the past ten years without any indication when the rise will stop. The testimony was uncontradicted of the need for substantially greater water storage facilities at an adequate elevation in this southwestern section to meet peak demands and assure at such times continuance of service to consumers and proper protection in case of fire. The present tank was almost dewatered in 1955 during periods of maximum water use, although no failure of supply actually occurred. Additional transmission mains into the area from the main pumping stations installed by the company in recent years, along with similar improvements and more storage facilities constructed in other parts of the territory, it was said will not meet the problem.

The particular plot was described by the company witnesses as "ideal" and "the best site we were able to find." Maximum elevation with sufficient ground area for the larger tank

were said to be basic location essentials. Investigation of other possible sites at anywhere near the necessary altitude disclosed, according to the testimony, disadvantageous features and all were in areas also municipally zoned for residential purposes.

The opposing contentions advanced by the borough, by affirmative evidence and through the medium of cross-examination, did not seriously attack the company's claim of need for additional facilities of some kind in the southwestern section, but stressed injury from location at this particular site in the light of the actual characteristics of the neighborhood and the zone plan. The testimony was confined to the quite natural objections of nearby residents and of the community generally based on aesthetic aspects and some claimed interference with light and air, and to the opinion of a local real estate broker, not very solidly grounded, that adjacent property values would decrease substantially.

The board found, in adopting the findings of fact of its hearing examiner, that the proposed tank was required in order that the company might continue to render safe, adequate and proper service to present and future customers in the southwestern part of its territory and that the premises in question was the best available location, any other site having requisite area and elevation also being in a residential area. Mention was made in the findings of the present structures on the site and the zoning regulations. The determination was in the statutory language that the erection of the tank at this site "is reasonably necessary for the service, convenience or welfare of the public."

On this appeal the borough advances two grounds of attack on the board's determination: first, that a proper construction of the statute requires a weighing of the detriment to the public welfare inherent in allowing a use contrary to a municipal zoning ordinance against the benefit conferred by the erection of the facility, which the board failed to do; and second, that in order to establish "reasonable necessity," it was incumbent upon the company to present

alternative solutions or plans, and that such was not done. Both grounds go to the construction of the statute as well as to the sufficiency of the evidence before the agency. The appellant would have us order the board to deny the petition or remand the case for redetermination on proper application of the alleged required standards.

Our consideration of these questions must, of course, lie within the framework of the principles now well settled in this State defining the power and function of an appellate court in reviewing the determination of an administrative agency. The court concerns itself with whether there has been any violation of the State or Federal Constitutions, whether the result is within and in accordance with the legislative grant and the standards prescribed thereby, and whether there has been fraud, bad faith, or manifest abuse of discretion in the sense of unjustly discriminatory, arbitrary, or capricious action. *In re Sanders,* 40 *N. J. Super.* 477, 483 (*App. Div.* 1956). Any review of the facts must be confined to the question of whether they are supported by substantial evidence, *i. e.,* such evidence as a reasonable mind might accept as adequate to support a conclusion. *In re Plainfield-Union Water Co.,* 14 *N. J.* 296, 307 (1954); *In re Central Railroad Co. of New Jersey,* 29 *N. J. Super.* 32, 38 (*App. Div.* 1953); *In re Sanders, supra; Hornauer v. Division of Alcoholic Beverage Control,* 40 *N. J. Super.* 501 (*App. Div.* 1956). The rule has also been expressed as confinement to an inquiry of "ascertainment of whether the evidence before the board furnished a reasonable basis for its action." *In re Greenville Bus Co.,* 17 *N. J.* 131, 137 (1954); *New Jersey Power & Light Co. v. Borough of Butler,* 4 *N. J. Super.* 270, 279 (*App. Div.* 1949). *Cf. R. S.* 48:2–46. It is soundly and frequently stated that a reviewing court should not substitute its independent judgment for that of the administrative tribunal where there is "a mere difference of opinion concerning the evidential persuasiveness of relevant testimony." *In re Sanders, supra,* 40 *N. J. Super.,* at *page* 483. The rule-given power (*R. R.* 4:88–13) to review facts and make independent findings

as the interests of justice may require, in effect, a trial *de novo*, should be most cautiously invoked. *In re Larsen*, 17 *N. J. Super.* 564, 577–578 (*App. Div.* 1952).

It is also fundamental that the function of the administrative tribunal under this type of legislative delegation, where it is under a duty to consider evidence and apply the law to the facts as found, is *quasi*-judicial in nature and not merely ministerial. *Pennsylvania Railroad Co. v. New Jersey State Aviation Commission*, 2 *N. J.* 64, 70 (1949). The agency must make an independent determination in each case on the facts. *Fornarotto v. Board of Public Utility Commissioners*, 105 *N. J. L.* 28, 33 (*Sup. Ct.* 1928). Its duty in the instant type of case, for example, goes far beyond a mere rubber stamp of approval on the utility's choice so long as the latter has not acted "wantonly, capriciously or unreasonably." *Cf. Lower Chichester Township v. Pennsylvania Public Utility Commission*, 180 *Pa. Super.* 503, 119 *A. 2d* 674, 676, 678 (*Super. Ct.* 1956). The agency, especially one experienced and of demonstrated competence, must assume a real responsibility in weighing and considering the facts and judicially adjudicating the controversy before it. See *In re Larsen, supra*, 17 *N. J. Super.*, at *page* 577.

R. S. 40:55–50, never before construed by our courts, is, essentially, a legislatively created method for the resolving of conflicts between different interests and policies, to be determined by the criteria set forth in the statute in the light of other expressions of public policy found in related statutory enactments. So the basic question is one of intent to ascertain the will of the Legislature as to which policy or interest shall prevail in a given situation or type of situation and by what standards or tests the decision between the two shall be made under particular circumstances. *Cf. Town of Bloomfield v. New Jersey Highway Authority*, 18 *N. J.* 237 (1955); *Aviation Services, Inc., v. Board of Adjustment of Hanover Township*, 20 *N. J.* 275 (1956). In our case the Legislature has said the broad public interest in utility services shall prevail over local interests expressed

through prohibiting provisions of a municipal zoning ordinance where the site of the building or structure "is reasonably necessary for the service, convenience or welfare of the public."

Comparable statutes are found in related fields of conflict involving public utilities versus other public interests or private rights. *R. S.* 48:2–14 provides that no privilege or franchise granted to any public utility by a political subdivision of this State shall be valid until approved by the board, which shall be given on its determination that the same "is necessary and proper for the public convenience and properly conserves the public interests." The right of eminent domain granted to a utility may only be exercised against the private landowner if the board finds that "the property desired is reasonably necessary for the service, accommodation, convenience or safety of the public and that the taking of such property is not incompatible with the public interest and would not unduly injure the owners of private property." *R. S.* 48:7–4. The board is given power to determine disputes between electric companies as to territories to be served by the standards of "necessary and proper for the public convenience" and to "properly conserve the public interest." *R. S.* 48:7–5. See also *R. S.* 40:62–12 and 40:62–65, both as amended.

Counterparts of the section under consideration are found in other states, notably Massachusetts and Pennsylvania, whose statutory enactments follow the same procedural pattern and prescribe the criteria in substantially the same language. *Town of Wenham v. Department of Public Utilities,* 127 *N. E. 2d* 791 (*Mass. Sup. Jud. Ct.* 1955); *Lower Chichester Township v. Pennsylvania Public Utility Commission, supra.* Connecticut provides a two-step procedure, first, the local zoning commission, and then an appeal to the state utility regulatory body. *Jennings v. Connecticut Light & Power Co.,* 140 *Conn.* 650, 103 *A. 2d* 535 (*Sup. Ct. Err.* 1954). The wisdom of a definite statutory expression of public policy, with standards and procedure to be applied in resolving conflicts, is evidenced by the contrariety

of judicial opinion between jurisdictions without such legislative expression in the particular situation. Compare *Sunny Slope Water Co. v. City of Pasadena,* 1 *Cal.* 2d 87, 33 *P.* 2d 672 (*Sup. Ct.* 1933), with *Duquesne Light Co. v. Upper St. Clair Township,* 377 *Pa.* 323, 105 *A.* 2d 287 (*Sup. Ct.* 1954).

While citing the statutes of other states, it may not be amiss to point out differences in coverage, so to speak, from our own. Massachusetts covers "building, structure or land." Pennsylvania refers only to a "building." *R. S.* 40:55–50 expressly mentions only "building or structure," thereby precluding its application to uses of land alone not involving buildings or structures. This omission may well be due to the fact that the section was enacted as part of the legislation (*L.* 1928, *c.* 274) authorizing municipal zoning ordinances to limit and restrict the construction and use of buildings and structures pursuant to the 1927 amendment to *Article* IV, *Section* VI, *paragraph* 5 of the 1844 *Constitution* and has not been amended since the *Constitution of* 1947 (*Article* IV, *Section* VI, *paragraph* 2) and subsequent legislation (*L.* 1948, *c.* 305) expressly included the nature and extent of the uses of land within the local regulatory power.

Perhaps it should also be noted that our statute is applicable to those private entities furnishing those services for public use specified in *R. S.* 48:2–13, as amended, as well as to those municipally operated utilities referred to in *R. S.* 40:62–24 in respect to acts in supplying services beyond the corporate limits of the municipality. Nothing said in this opinion is intended to express any view on the resolution of intra-municipal conflicts, *i. e.,* on the question whether a municipal corporation operating a utility within its own boundaries is bound, in its operation thereof, by the provisions of its own zoning ordinance. Compare *Sunny Slope Water Co. v. City of Pasadena, supra,* with *Taber v. City of Benton Harbor,* 280 *Mich.* 522, 274, *N. W.* 324 (*Sup. Ct.* 1937). *Cf. Thornton v. Village of Ridgewood,* 17 *N. J.* 499, 512–515 (1955). The subject of the applicability of

local zoning ordinances to the activities of other governmental units on the same or different levels, where the Legislature has not directly expressed any intention concerning or criteria for resolving the conflict, has been recently considered by our Supreme Court in *Town of Bloomfield v. New Jersey Highway Authority, supra,* and *Aviation Services, Inc. v. Board of Adjustment of Hanover Township, supra.* The rationale of those decisions in arriving at the legislative intent furnishes an equally sound approach in construing *R. S.* 40:55–50.

The prime importance to modern living, commerce and industry of water, electricity, gas, sewage disposal, public transportation of goods and people and rapid means of personal communication requires no elaboration. Governmental regulation of these essentials when furnished by private corporations, as well as direct governmental furnishing of many of them, has long since been had and upheld as in the highest public interest. The greatest public good generally requires the private public utility corporation to be given a monopoly, or nearly so, in the geographical area of its operation, subject to strict regulation. This regulation in New Jersey has imposed upon the Board of Public Utility Commissioners, at least since 1911, "general supervision and regulation of and jurisdiction and control over all public utilities * * * and their property, property rights, equipment, facilities and franchises so far as may be necessary for the purpose of carrying out the provisions of this Title." *R. S.* 48:2–13, as amended. The board has the power to "require every public utility * * * to conform to the duties imposed upon it thereby [the laws of the State and municipal ordinances] or by the provisions of its own charter." *R. S.* 48:2–16. It is obligated to "require any public utility to furnish safe, adequate and proper service and to maintain its property and equipment in such condition as to enable it to do so." *R. S.* 48:2–23. See also *R. S.* 48:2–25.

The proper regulation of public utilities and the enforcement of the obligations of proper service are obviously

matters of more than local concern. A utility rarely confines its sphere of operation to the boundary lines of one political subdivision. The performance of its obligations to the public and the power of the board to compel such performance in the interest of the general public good cannot be thwarted by contrary action of one municipality, which might well be inclined to view a situation only from the standpoint of its own citizens.

Municipal zoning ordinances likewise bear a real and substantial relation to the public welfare under the principle that the exercise of rights incident to the ownership of private property may be restricted in the interest of the general welfare of the inhabitants of the municipality, and in some instances those of adjoining governmental units, for purposes specified by the Legislature. *R. S.* 40 :55–32. But such regulation is basically from the local aspect for a local public purpose. This exercise of the police power is also of relatively recent origin and development. Broadly speaking the legislative intent is clear that such local regulation, however beneficent and important, is of secondary importance to the broader public interest involved in assuring adequate water service to a much larger area.

This concept is inherent in ascertaining the intent as to *R. S.* 40 :55–50. It is further borne out by the language of the standard prescribed to govern administrative action, which, though general in nature, is sufficient to guide the board and satisfy constitutional requirements. *Cf. R. S.* 48 :2–14; *In re Greenville Bus Co., supra,* 17 *N. J.,* at *page* 135. The only criterion is reasonable necessity of the situation of the building or structure "for the service, convenience and welfare of the public." The conclusion is irresistible that "the public" refers to the public served by the utility and not the limited group benefited by the zoning ordinance. There is no additional language such as we find in *R. S.* 48 :7–4, setting the standards for utility condemnation of private property, where the board must also find that the taking of the property is "not incompatible with the public interest and would not unduly injure the

owners of private property." Moreover, our courts have always held, in interpreting the other analogous statutes previously cited, that the criterion of necessity for the public welfare, however expressed, must not be restricted to the necessities of a circumscribed territorial locality or the immediate local public affected, but shall encompass those of the larger public without regard to territorial limitations. *Fornarotto v. Board of Public Utility Commissioners, supra; New Jersey Power & Light Co. v. Borough of Butler, supra.*

 *R. S.* 40:55–50, and its underlying concept of superiority of the broader public welfare, is an unwritten exception to be read into every municipal zoning ordinance. The concept is certainly powerful enough to overcome the present seemingly strong judicial expression of a policy against the extension of non-conforming uses even by the variance procedure. See *Ranney v. Istituto Pontificio Delle Maestre Filippini,* 20 *N. J.* 189 (1955). In fact, the entrusting of the decision to a state agency presumably with broader horizons is clearly indicative of the intention that a utility should not have to depend on securing a local variance in cases where the importance of the installation to the general good overshadows the municipal policy. But despite this primary emphasis of the statute, the intent is equally clear that the Legislature did not intend the local regulation to be overridden willy-nilly in all cases. Otherwise the Legislature could simply and shortly have said that no public utility shall be subject to a municipal zoning ordinance. The constantly growing importance to all of zoning and planning, particularly in the present unprecedented period of residential and industrial growth in our suburban and formerly rural areas, has its place in the composite picture. So the board must take into account in arriving at its determination the provisions of the local zoning ordinances and the community zone plan finding expression through it, as well as the actual physical characteristics of the plot involved and the surrounding neighborhood. It is the "situation," *i. e.,* the particular site or location, which must be found "reasonably necessary." We do not

mean to suggest, however, that the board cannot grant the petition unless the proofs would sustain a recommendation of variance by the local board of adjustment. *Cf. R. S.* 40 :55–39, as amended. The board's obligation is to weigh all the interests, even though when they are found to be equal or nearly so the utility is entitled to the preference. There are many cases that may be imagined where the result will be in favor of the local interest. Take, for example, a telephone company required to construct a new exchange building and business office to serve the increasing needs of an expanding area. A site is selected on a vacant lot in the middle of the town's finest residential area. The particular location is not necessary for technical or operational reasons. Surely it would seem in such an instance that the local interest should prevail. *Cf. Lower Chichester Township v. Pennsylvania Public Utility Commission, supra.*

In passing on appellant's second point that it was incumbent upon the water company to present for consideration alternative solutions or methods not involving the site in question, we are first concerned with the meaning to be ascribed to the term "reasonably necessary." Although the statute speaks only of necessity of the particular site, necessity for the building or structure at all at any location is a required element of the petitioner's proofs. There can be no doubt of the sufficiency of the evidence here on the need for additional facilities in this sector of the company's territory. Our courts have long viewed the vital need for an adequate public water supply as requiring that all contingencies must be provided for and the supply be so ample that a lack of water could not be reasonably apprehended, especially since consumption cannot be estimated with precision. *Olmsted v. Proprietors of Morris Aqueduct,* 47 *N. J. L.* 311, 328 (*E. & A.* 1885), a case involving the necessity for lands sought to be condemned for water supply purposes.

The word "necessary" standing alone does not mean absolutely necessary or indispensable. It has been so uniformly construed when used in other statutes specifying

a gauge to govern action of a public utility, *Olmsted Proprietors of Morris Aqueduct, supra; Sayre v. City of Orange,* 67 *A.* 933 (*Sup. Ct.* 1907), not officially reported; *Public Service Railway Co. v. Frazer,* 87 *N. J. Eq.* 679 (*Ch.* 1914) ; *Frazer v. Public Service Railway Co.,* 89 *N. J. Eq.* 569 (*E. & A.* 1917) ; as well as in similar situations arising at common law, *Lidgerwood Estates, Inc. v. Public Service Electric & Gas Co.,* 113 *N. J. Eq.* 403 (*Ch.* 1933). The proper connotation is that of reasonable necessity under all the particular circumstances. The addition of the adverb "reasonably" in *R. S.* 40:55–50 does little but emphasize that absoluteness or indispensability is not to be required. It is reasonable necessity for the proposed site in the light of all the facts and circumstances and balancing all interests that is the test prescribed. One of such circumstances generally is the availability of other locations, not municipally restricted, or, if so, less likely to cause injury to the neighborhood, and their comparative advantages and disadvantages with the plot for which approval is sought. Such evidence should ordinarily be tendered by the petitioner and was presented here. Another such factual circumstance, and no more than that, may well be, in certain cases, the possibility of other methods of attaining the needed improvement or addition to facilities not involving the site at all, or by a different and less objectionable kind of building or structure. No hard and fast rule may be laid down on this score. We do not think it obligatory on the utility to set up a lot of straw men and then knock them down. As part of its case in establishing basic necessity for the improvement itself apart from the location it should, however, show that the means or method proposed to meet the public need is reasonable and desirable, perhaps in relation to customary practices and methods in the industry and the company's existing methods, as well as any other pertinent factors, including any substantially greater expense of an alternative method which might be reflected in higher charges to its customers. Beyond this, the burden of demonstrating a feasible alternative method ought to devolve on

the objectors, as should a showing of alternative sites beyond those brought forward by the applicant. This view is in general accord with that expressed by the Supreme Judicial Court of Massachusetts in *Town of Wenham v. Department of Public Utilities, supra,* in construing a similar statute, even though that state appears to have a narrower scope of judicial review than New Jersey.

We come to the application of these legal principles to the evidence and findings in finally passing upon appellant's contentions. Although the findings of the agency are somewhat sparse and sketchy, it is clear that the board did weigh any detriment to the public welfare inherent in allowing a use contrary to the zoning ordinance. This is so despite a seemingly contrary statement by the examiner early in the hearing. The evidence fully presented the residential character and other physical characteristics of the neighborhood and community, the company's present structures and long continued use, and the possible injury to the locale if the new tank were permitted. The findings sufficiently advert thereto, both expressly and inherently, to warrant a conclusion of due consideration. The specific finding that the plot in question is the best available location and that any other suitable site was also in a residential zone is further evidence of a weighing of the adverse interests.

We think there was adequate evidence presented by the company on the question of alternative sites and methods of meeting the water needs of the area. The borough offered nothing affirmative on this score. The company showed that other possible sites with satisfactory area and elevation were equally restricted by zoning. This neighborhood had successfully lived with one large ground tank, an elevated tank and a pumping station for many years—in fact a large part of the neighborhood was established after the company started its operations. The method of water distribution by pump and tanks had been in use here for decades and is like that used in other parts of the company's system. The three structures present and proposed are closely interrelated in function and operation, both locally and as a

part of the entire integrated system. Close proximity of each is obviously essential. Utilization of the laws of gravitation implies customary practice. The only suggestion of any other schemes to meet the need, made in the course of cross-examination by the borough, was to provide additional water storage through increase in the size of transmission mains, a method that was said would not solve the problem, or by the installation of another elevated tank, which would not provide sufficient capacity. We conclude there was sufficient testimony presented by the company on the matter of alternative locations or methods to meet the requirements of proof previously outlined. As has been pointed out, alternative possibilities constitute only one factor or circumstance to be considered in determining reasonable necessity at the site in question. The board found that this particular tank is "required" for the company to continue proper service. This finding is grounded in sufficiently substantial evidence.

The board's determination that the location of the proposed tank is reasonably necessary for the service, convenience and welfare of the public is supported by substantial evidence of such quality that a reasonable mind might accept it as adequate to support this conclusion, all relevant factors and circumstances having been sufficiently presented and considered.

The order under review is affirmed.